Gary VITALE, M.D., Appellant,

v.

Maurice HENCHEY, Administrator of the Estate of Helen Hite Sallee; Donald Varga, M.D.; Athel Sparrow, M.D., Appellees,

and

Donald Varga, M.D. and Athel Sparrow, M.D., Appellant,

v.

Maurice Henchey, Administrator of the Estate of Helen Hite Sallee and Gary Vitale, M.D., Appellees.

Nos. 1998–SC–1035–DG,
1998–SC–1077–DG.

Supreme Court of Kentucky.

April 20, 2000.

Rehearing Denied Aug. 24, 2000.

Susan Phillips, William Swain, Boehl, Stopher & Graves, Louisville, Kentucky, for appellant/appellee, Gary Vitale, M.D.

Matthew Gay, Darby & Gazak, Louisville, for appellant/appellee, Donald Varga, M.D. and Athel Sparrow, M.D.

Freeda Clark, Clark & Grafton, Louisville, for appellee, Maurice Henchey and Helen Hite Sallee.

KELLER, Justice.

## I. ISSUES

These combined appeals present two primary issues.

Henchey, Sallee's Administrator, introduced proof at trial that Dr. Vitale operated on Sallee twice although Henchey, then acting as Sallee's medical power of attorney, had only consented for Drs. Wieman and Sparrow to do so. Henchey introduced no proof that this substitution of surgeons violated the accepted standard of medical care, and for this reason, the trial court directed a verdict against Henchey on the issue of liability. Was Henchey required to prove a violation of the accepted standard of medical care? Because surgery performed without the patient's consent gives rise to an action for the intentional tort of battery, and the accepted standard of medical care is not implicated by such a claim, we hold that such proof is not required.

Evidence introduced at trial demonstrated that after the surgeries and prior to her death, Sallee gave indications of her consciousness only by movement of her extremities and flinching her eyes in response to her name. The trial court found the evidence insufficient to show that Sallee endured any conscious pain and suffering and directed a verdict for the defendant physicians on the issue of damages for pain and suffering. Did the evidence create a jury issue as to whether she was conscious? Because the evidence was sufficient to support a finding that Sallee was conscious at times after the surgeries, we answer that it was.

Accordingly, we affirm the Court of Appeals' decision reversing and remanding the case for a new trial on the claim for battery.

## II. FACTS

■ We are reviewing the correctness of a directed verdict; therefore, we must view the evidence, although disputed, in the light most favorable to the party opposing the directed verdict.[1]

On October 13, 1993, Maurice Henchey received a phone call from Dr. Donald Varga advising him that his 95 year old mother, Helen Hite Sallee, had been hospitalized for a blood clot in her leg. Henchey traveled that day from his home in California to Louisville, Kentucky where he was provided with his mother's medical power of attorney which she had executed previously. The next morning, he met with Dr. Varga, his mother's regular physician, and Dr. Athel Sparrow, a surgical consultant brought into the case by Dr. Varga. At this time, Sallee was nonresponsive, confused and unable to recognize or communicate with others. On October 16, with Henchey's consent, Dr. Sparrow operated on Sallee for the removal of the blood clot in her leg. A gallbladder problem also developed and Dr. Sparrow performed surgery for this problem. On October 26, believing that

---

1. *See Lovins v. Napier*, Ky., 814 S.W.2d 921 (1991).

his mother's prognosis was favorable and her condition was improving, Henchey returned to California.

On November 2, Henchey received a call from Dr. Varga who indicated that Sallee, who remained in a confused state, was taking a turn for the worse. Three days later, Mr. Henchey returned a phone call to Dr. Sparrow and was advised that Sallee needed another surgical procedure that was outside of Dr. Sparrow's speciality. Dr. Sparrow informed him that Dr. Thomas Wieman was the best person to perform this surgery and added, "there is a guy around town named Dr. Gary Vitale who does the same thing, but he is too aggressive, not compassionate, and I never use him." Henchey gave his consent for Dr. Wieman to perform the surgery on his mother. Unknown to Henchey, however, Dr. Vitale, who was Dr. Wieman's partner, performed the surgery because Dr. Wieman planned to be out-of-town and would be unavailable to provide follow-up-care to Sallee over the weekend.

Henchey was next contacted by Dr. Varga on November 6 when Dr. Varga called and advised that Sallee needed yet another operation and if the procedure wasn't done that night they could "write her off." Henchey was informed by Dr. Varga that Dr. Sparrow was waiting on the other line for Henchey's approval to proceed. Henchey consented to Dr. Sparrow proceeding with the surgery. Dr. Vitale also performed this surgery, and, again, Henchey was not notified.

The next morning, November 7, Dr. Vitale called Henchey and informed him that he had performed the last surgical procedures on his mother and that he was "not too hopeful" about her chances. Henchey asked Dr. Vitale, "who the hell are you and why are you involved?" and Dr. Vitale quickly ended the conversation. Helen Hite Sallee died on November 8.

Henchey, now the administrator of his mother's estate, filed an action in that capacity against Drs. Vitale, Varga and Sparrow ("physicians"), and alleged in paragraph five (5) of the complaint that Dr. Vitale, at the request of Drs. Varga and Sparrow, performed surgical procedures without Henchey's consent:

> During the aforesaid admission, on or about November 6, 1992, at a time when plaintiffs decedent, Helen Hite Sallee, had become physically and mentally disabled and unable to make medical treatment decisions on her own behalf, defendant Varga and/or defendant Sparrow, without the knowledge or consent of Maurice Henchey, and contrary to his express instructions to them, requested, authorized and/or permitted the defendant, Dr. Gary Vitale, M.D., to perform medical services and surgery on plaintiff's decedent, Helen Hite Sallee. Defendant, Dr. Gary Vitale, M.D. performed said medical services and surgery on plaintiffs decedent, Helen Hite Sallee, without Maurice Henchey's prior knowledge and without obtaining any consent or authority from Maurice Henchey to do so, nor would such consent or authority have been granted by Maurice Henchey had it been sought.

The complaint also alleged that Sallee endured pain and suffering as a result of the unauthorized surgeries and sought both compensatory and punitive damages.

Henchey testified that he was not informed about the change in surgeons and he believed Drs. Wieman and Sparrow would perform the surgeries which were actually performed by Dr. Vitale. Henchey further testified that, based on Dr. Sparrow's comments to him about Dr. Vitale, he would not have consented to Dr. Vitale performing the surgeries on his mother. Henchey denied the physicians' contention that consents authorizing Dr. Vitale to perform the November 6 surgeries were read to him over the phone and that he gave a blanket consent for those surgeries.

At the close of Henchey's proof, the trial court directed a verdict dismissing the complaint against the physicians based

upon either of two grounds: (1) Henchey had not shown that Dr. Vitale's performance of the surgeries without Henchey's consent violated accepted standards of medical care, or (2) Henchey had failed to show Sallee endured conscious pain and suffering as a result of the surgeries. Disagreeing with the trial court, the Court of Appeals held that a physician who fails to obtain a patient's consent to surgery commits battery and that the evidence regarding Sallee's consciousness sufficiently presented a jury issue as to damages for pain and suffering. Accordingly, the Court of Appeals reversed and remanded the case for trial on the claim for battery. The physicians sought review by this Court. We agree with the Court of Appeals and, therefore, affirm.

### III. LACK OF CONSENT

Both the trial court and the physicians cite *Holton v. Pfingst*[2] and the Kentucky Informed Consent Statute[3] as supporting their position that, in order to recover, Henchey must prove that the physicians breached the applicable standard of care by substituting surgeons without Henchey's consent. The fallacy in the physician's argument and citation is that the situation presented in this case, where Henchey testified that he did not consent for Dr. Vitale to act as the surgeon, is wholly distinguishable from cases in which the physician obtains consent, but fails to disclose the risks of surgery to a patient.

In *Holton*, the patient sued the surgeon for "his alleged failure to properly disclose to her the *risks and hazards* involved in a proposed surgical procedure."[4] For actions of that type, we rejected traditional concepts of assault and battery and of fraud and deceit and adopted the negligence approach:

"The greater number of decisions now regard the failure to disclose a mere risk of treatment as involving a collateral matter, and negligent malpractice only, which brings into question professional standards of conduct." (Citing W. Prosser, Handbook of the Law of Torts, 106 (4th Ed.1971)).

. . . .

Hence, we are persuaded that the prevailing view to the effect that the action, regardless of its form, is in reality one for negligence in failing to conform to a proper professional standard is the soundest approach.[5]

The Kentucky Informed Consent Statute,[6] which was enacted shortly after the decision in *Holton*, also treats a claim involving lack of informed consent as to the *risks and hazards* inherent in the proposed treatment or procedure as an action for negligence:

In any action brought for treating, examining, or operating on a claimant wherein the claimant's informed consent is an element, the claimant's informed consent shall be deemed to have been given where:

The action of the health care provider in obtaining the consent of the patient or another person authorized to give consent for the patient was in accordance with the *accepted standard of medical or dental practice among members of the profession with similar training and experience;* and

(2) A reasonable individual, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedure and medically or dentally acceptable alternative procedures or treatments and *substantial risks and hazards inherent in the proposed treatment*

2. 534 S.W.2d 786 (1975).

3. KRS 304.40–320

4. *Holton, supra* note 2 at 786 (emphasis added).

5. *Id.* at 788.

6. KRS 304.40–320.

*or procedures* which are recognized among other health care providers who perform similar treatments or procedures; . . . . [7]

We agree with the trial court and the physicians that, as a result of *Holton* and the Kentucky Informed Consent Statute, an action for a physician's failure to disclose a *risk or hazard of a proposed treatment or procedure* is now undisputedly one of negligence and brings into question professional standards of care. However, the physicians, as did the trial court, confused the issue of *informed* consent, i.e., the failure to disclose a risk or hazard of the surgeries, with the issue of *no* consent, or whether *any valid* consent was obtained prior to Dr. Vitale's performance of the surgeries. *Holton* and the Kentucky Informed Consent Statute do not apply when surgery is performed without the patient's consent and Henchey's claim here is based on the lack of consent for Dr. Vitale to perform the surgeries. Henchey testified at trial that he gave his consent to surgeries which were to be performed by Drs. Wieman and Sparrow, but did not give his consent to Dr. Vitale's performance of those surgeries. Henchey's claim does not allege that the physicians did not advise him of the risks inherent in the surgeries, nor does he even suggest that Dr. Vitale improperly performed the surgeries. Consequently, *Holton* and the Kentucky Informed Consent Statute do not apply. Henchey alleges that he did not, and would not have, consented to Dr. Vitale performing the surgeries. This is not a claim for negligence, but for battery.

Kentucky recognizes an action for battery when a physician performs an operation without the consent of the patient.[8] In *Tabor v. Scobee*,[9] where an operation was performed without the patient's consent, we adopted the rule of law stated by Justice Cardozo in *Schloendorff v. Society of New York Hospital:*[10]

> In the case at hand, the wrong complained of is not merely negligence. It is trespass. Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages. . . . This is true, except in cases of emergency where the patient is unconscious, and where it is necessary to operate before consent can be obtained.[11]

Such an action is different from a negligence action for medical malpractice because the claim depends on neither professional judgment nor the physician's surgical skill.[12] It also does not involve the type of negligence that occurs when a physician has not made a proper disclosure of the risks inherent in a treatment or procedure.[13] Battery is an intentional tort;[14] it is not committed by a negligent act.[15]

While we have not previously been presented with this issue of whether the doctrine of informed consent supplants a

---

7. *Holton, supra* note 2 at 788 (emphasis added).

8. *See Van Meter v. Crews*, Ky., 149 Ky. 335, 148 S.W. 40 (1912) (where the complaint alleged the physician operated without consent and performed the operation unskillfully); *Tabor v. Scobee*, Ky., 254 S.W.2d 474 (1952); *Keel v. St. Elizabeth Medical Center*, Ky., 842 S.W.2d 860 (1992) (Leibson, J., concurring at 862); *Lewis v. Kenady*, Ky., 894 S.W.2d 619 (1994).

9. Ky., 254 S.W.2d 474 (1952).

10. 211 N.Y. 125, 105 N.E. 92, 93 (1914).

11. *Id.* at 475.

12. *Tabor v. Scobee*, supra note 9 at 476.

13. *Id.; Keel v. St. Elizabeth Medical Center*, supra (Leibson, J., concurring at 862); *Lewis v. Kenady*, supra (Leibson, J., dissenting at 623).

14. *Graves v. Dairyland Ins. Group*, Ky., 538 S.W.2d 42 (1976).

15. *Id.*

patient's cause of action for battery, one court, however, has considered and rejected such an assertion:

[W]e find nothing in case law or secondary sources to suggest that the doctrine of informed consent has displaced the common law remedy of battery in cases of no consent. Because the informed consent doctrine apparently began as an offshoot of battery, for a time there was confusion concerning whether a lack of informed consent case should proceed upon a theory of battery or negligence. See 2 David W. Louisell & Harold Williams, Medical Malpractice, ¶ 22.04 (1991). Most courts, however, have concluded that an informed consent action is more properly grounded in negligence, and reserve battery solely for the cases involving a complete lack of consent. Id. See, e.g., *Baltzell*, 752 S.W.2d at 906 (lack of informed consent is not within concept of battery, "which is reserved for cases where the physician ignores patient's request for explanation or where a patient consents to one type of treatment but physician performs a substantially different treatment"); *Miller v. Kennedy*, 11 Wash.App. 272, 522 P.2d 852, 860 (1974), aff'd, 85 Wash.2d 151, 530 P.2d 334 (1975) (operation without consent is battery; failure to advise patient of perils is considered under negligence concepts). However, no authority with which we have been acquainted suggests that a battery case based on a complete lack of consent should be pursued through the negligence principles of the informed consent doctrine. Thus, we find no support for the contention that the common law

claim of battery, in a case where no consent was obtained, has been supplanted by the doctrine of informed consent. . . . [16]

We agree. Neither *Holton* nor the Kentucky Informed Consent Statute transformed a battery claim against a physician who operates without a patient's consent into a negligence action; it remains an action for battery.

 Additionally, the physicians question whether an action for battery will properly lie against them since they did not act with intent to harm Sallee. We answer that it will. Although Kentucky case law defines *common* law civil battery simply as "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him," [17] intent is an essential element.[18] Similarly, the Restatement (Second) of Torts includes intent as an element of battery: "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other . . . and (b) a harmful contact with the person of the other directly or indirectly results." [19] But, while intent is an essential element of battery, it refers to the consequences of an act, i.e. the contact, rather than the act itself [20] and all consequences which the actor desires to bring about are intended as well as consequences that are certain or substantially certain to result from the act.[21] The intent necessary for battery "is not necessarily a hostile intent, or a desire to do any harm." [22] Rather, it is an intent to make contact with the person, not the

16. *Lounsbury v. Capel*, Utah App., 836 P.2d 188, 194 (1992), cert. denied, 843 P.2d 1042 (Utah 1992).

17. *Sigler v. Ralph*, Ky., 417 S.W.2d 239, 241 (1967), (quoting Caldwell's Kentucky Judicial Dictionary, Volume I, p. 262).

18. *Graves v. Dairyland Ins. Group, supra* note 14.

19. Restatement (Second) of Torts § 13 (1965); see also W. Prosser and W.P. Keeton, Prosser

and Keeton on Torts, § 9 at 39 (5th ed.1984) (hereinafter "Prosser and Keeton on Torts").

20. Restatement (Second) of Torts § 8A (1965) Comment a.

21. *Id.* Comment b.

22. Prosser and Keeton on Torts, § 8 at 36 (5th ed.1984).

intent to cause harm.[23] Accordingly, the surgeon's lack of intent to harm the patient is no bar to an action for battery:

> [A] surgeon who performs an operation upon a patient who has refused to submit to it is not relieved from liability by the fact that he honestly and, indeed, justifiably believes that the operation is necessary to save the patient's life. Indeed, the fact that medical testimony shows that the patient would have died had the operation not been performed and that the operation has effected a complete cure is not enough to relieve the physician from liability.[24]

"Harm denote[s] the existence of loss or detriment of any kind to a person...."[25] "Bodily harm is any physical impairment of the condition of another's body, or physical pain or illness."[26] In other words, "[t]here is an impairment of the physical condition of another's body if the structure or function of any part of the other's body is altered to any extent even though the alteration causes no other harm."[27] Thus, while the physicians did not intend to harm Sallee, the operations resulted in harmful contact to her,[28] and an action for battery will lie against them.

■■■ Dr. Vitale presents a separate argument in his defense. Drs. Sparrow and Varga claim they obtained telephone authorizations from Henchey for Dr. Vitale to operate on Sallee. Pursuant to these alleged telephone authorizations, hospital staff prepared written consents for the operations and filed them in Sallee's medical records. One consent indicates that it was obtained via telephone from Henchey, was signed by Dr. Sparrow, and witnessed by a nurse. The other consent, while not signed by Dr. Varga, indicates that consent was obtained by Dr. Varga "by long distance phone call" from Henchey and it was witnessed by two nurses. All of the evidence at trial indicated that Dr. Vitale was shown the consent forms, which included his name, prior to performing the operations. He asserts that he was entitled to rely upon the consents allegedly obtained by Drs. Sparrow and Varga. We must disagree. To be effective, the consents must have been given by one who had the capacity to give them.[29] Drs. Sparrow and Varga had no independent capacity to consent to the surgeries. So, if Henchey did not authorize Dr. Vitale to perform the surgeries, the consents are not effective and do not preclude an action for battery against him. He intended to operate on Sallee, and, as "harmful" is interpreted in the context of battery claims, the contact involved in the operation was harmful to her. If he operated without her consent, he committed a battery upon her.

■■■ Lack of consent is an essential element of battery.[30] Therefore, the absence of consent must be proved as a necessary part of the plaintiff's case. Henchey testified that he did not consent

23. *Id.*

24. Restatement 2nd, Torts § 13, Comment c.

25. Restatement 2nd, Torts § 7(2).

26. Restatement 2nd, Torts § 15.

27. Restatement 2nd, Torts § 15, Comment a.

28. See *Id.*, Illustration 1 ("A has a wart on his neck. His physician, B, advises him to submit to an operation for its removal. A refuses to do so. Later A consents to another operation, and for that purpose is anesthetized. B removes the wart. The removal in no way affects A's health, and is in fact beneficial. A

has suffered bodily harm."); See also *Boruff v. Jesseph*, 576 N.E.2d 1297, 1300 (Ind.App. 1991) (Barteau, J., concurring in part and dissenting in part) ("Boruff alleges that Milan committed a battery when he performed an operation on her without her consent. In order to prove her battery allegation, she needs to show a non-consensual harmful or offensive contact (operation) resulting from an act intended to cause her to suffer the contact (use of hand or surgical instrument to invade her body)." *Id.*)

29. Restatement 2nd, Torts § 892A; and Comment b.

30. Restatement 2nd, Torts § 13, Comment d.

to Dr. Vitale performing the surgeries and maintains that he would not have done so. He maintains that he consented only to Drs. Wieman and Sparrow performing them. The physicians do not claim that there existed an emergency of such urgency that the surgeries should have been performed regardless of whether Henchey consented to Dr. Vitale acting as the surgeon. Henchey's consent was limited and that limit was crossed when Dr. Vitale performed the surgeries. He was not within the scope of the consent given by Henchey. Just as we have previously held that a surgeon commits battery by removing his patient's Fallopian tubes where the patient has submitted to an operation for appendicitis,[31] we now hold that a surgeon, except in an emergency situation,[32] commits a battery by operating on a patient who has not consented to that surgeon performing the operation. Accordingly, Dr. Vitale and those acting in concert with him [33] are liable for any damages resulting from any surgeries that Henchey shows Dr. Vitale performed without his consent.

## DAMAGES

A plaintiff need not prove actual damages in a claim for battery because a showing of actual damages is not an element of battery [34] and, when no actual damages are shown for a battery, nominal damages may be awarded.[35] Accordingly, because we are remanding this case for trial on the battery claim, the issue of whether a verdict should have been directed for the failure to prove actual damages is now moot. However, since the issue of whether Henchey is entitled to an instruction on damages for pain and suffering may recur on retrial, we will address the physicians' two arguments in support of

their contention that the evidence did not support a finding that Sallee endured any pain and suffering as a result of the surgeries by Dr. Vitale. First, they argue that she was unconscious prior to the operations and remained so until her death. Therefore, the physicians assert that she did not suffer damages since damages for pain and suffering are not allowed to an unconscious person. We agree that pain and suffering would not be a proper element of damages if Sallee was unconscious from the time of the surgeries until her death.[36] Damages for pain and suffering may be awarded, however, "if the injured person was 'partly conscious,' had intervals of consciousness, or was conscious for a short time before death." [37] The evidence presented at trial indicated that Sallee, after the surgeries and prior to her death, was treated for pain, observed to be in pain, moved her extremities and flinched her eyes in response to her name. We agree with the Court of Appeals that this evidence was sufficient to support a finding that Sallee endured conscious pain and suffering at times after the surgeries and before her death. It was, therefore, a jury issue.

Second, the physicians argue that Henchey was not entitled to any instruction as to damages because no evidence was presented that Sallee suffered more following Dr. Vitale's surgery than she would have if the surgery had been performed by Drs. Wieman or Sparrow. They cite no authority for this argument and we have found none. A person injured as a result of a battery is entitled to recovery for any damages resulting therefrom.[38] Consequently, if Dr. Vitale operat-

31. *Tabor v. Scobee,* supra note 9.

32. Restatement 2nd, Torts § 892D.

33. Restatement 2nd, Torts § 876.

34. *Sigler v. Ralph,* supra note 17; Restatement (Second) of Torts § 13 (1965).

35. AmJur2d, Assault and Battery §§ 144, 146.

36. 22 AmJur2d, Damages §§ 241 & 249.

37. *Id.*

38. 22 AmJur2d, Damages § 130 6 AmJur2d, Assault and Battery §§ 144 & 147.

ed without consent, Henchey is entitled to recover for any conscious pain and suffering Sallee endured as a result of the surgeries performed by Dr. Vitale regardless of the fact that she may have endured the same or similar pain and suffering if the surgeries had been performed by Drs. Wieman and Sparrow.

The judgment of the Court of Appeals is affirmed, and we remand this case to the trial court for trial on the battery claim.

LAMBERT, C.J.; GRAVES, STUMBO and WINTERSHEIMER, JJ., concur.

COOPER, J., dissents by separate opinion, with JOHNSTONE, J., joining that dissent.

COOPER, Justice, dissenting.

This kind of lawsuit is sometimes referred to as a "money hunt." Henchey consented to the surgical procedure which was performed on his mother and does not assert that the procedure was negligently performed. His quest for damages is premised solely on the fact that the surgery was performed by Dr. Vitale instead of by his partner, Dr. Wieman. Henchey did not know either doctor, but accepted Dr. Sparrow's referral to Wieman because Sparrow thought Vitale was "too aggressive" and "uncompassionate." Although Henchey did not specifically authorize Dr. Vitale to perform the surgery, neither did he specifically object to his doing so. Compare Johnson v. McMurray, 461 So.2d 775 (Ala.1984) and Taylor–Gove v. St. Joseph's Hosp. Health Center, 242 A.D.2d 879, 662 N.Y.S.2d 675 (1997), both of which were cases wherein the patient had specifically objected to being treated by the physician who performed the surgery. Henchey does not claim that Dr. Vitale performed this surgery either "too aggressively" or "uncompassionately," much less unprofessionally. Vitale performed the surgery only because Wieman was called out of town and was, thus, unavailable to provide follow-up care.

The primary authorities cited by the majority, i.e., Tabor v. Scobee, Ky., 254 S.W.2d 474 (1951), Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 105 N.E. 92 (1914), overruled on other grounds, Bing v. Thunig, 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (1957), and Lounsbury v. Capel, 836 P.2d 188 (Utah Ct.App.1992), are all cases in which the patient did not consent to the type of surgery which was actually performed. In my view, the ancient tort of battery should be reserved for nonconsensual physical contact which is offensive or harmful to the victim, and that claims of tortious conduct with respect to the practice of medicine should be addressed by application of negligence principles relative to malpractice and informed consent, not battery. I would reverse the Court of Appeals and reinstate the judgment of the trial court.

JOHNSTONE, J., joins this dissenting opinion.