NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0055n.06

No. 21-5649

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

REINELLA S. KIRILOVA,

      Plaintiff,

CHRISTOPHER HALL, as Administrator of the
Estate of William Allen Young, Jr.,

      Plaintiff-Appellant,

v.

RUSSEL BRAUN, Individually and in the Official
Capacity as a Louisville Metro Police Officer;
RANDALL RICHARDSON, Individually and in the
Official Capacity as a Louisville Metro Police Officer;
PAIGE YOUNG, Individually and as a Member of the
Louisville Metro Police,

      Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Jan 27, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

OPINION

Before:  CLAY, GRIFFIN, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  In February 2017, Louisville Metro Police Officers shot and killed William Allen Young, Jr., a 32-year-old man experiencing homelessness and mental illness, in an abandoned house.  The administratrix of Young's estate sued the officers, Louisville Jefferson County Metro Government, and the Chief of the Louisville Metro Police Department, alleging violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 and state law tort claims against the individual defendants.  The district court dismissed the Metro Government and the police chief and granted summary judgment to the

individual officers based on qualified immunity. This appeal of those decisions followed.[1] For the reasons set out below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

Body cameras captured most of the relevant events of this case, therefore, we describe the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007). Because this appeal arises from the officers' motion for summary judgment based on qualified immunity, we view any relevant gaps or uncertainties the videos leave in the light most favorable to Young's Estate. *See Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015) (accepting the plaintiff's version of the facts because they were not "clearly contradict[ed]" by the video). Deposition testimony and other evidence presented to the district court provide further facts for our review.

That clinical explanation of what facts we consider, however, does not take away from the tragedy of the events surrounding Young's death. That evening, Louisville Officers responded to reports of a break-in in a neighborhood near Churchill Downs. Neighborhood residents directed the officers to a boarded-up vacant house, to which they believed the intruder had fled. The officers called for back-up and began searching around the vacant house for the suspect. As they scoured the area, at least one officer noticed someone in a second-floor window of the house, but officers heard no response when they called for the individual to come out of the home.

At that point, the officers did not know that the person in the window was 32-year-old William Young, Jr., who had long dealt with homelessness and mental illness. After living in state custody throughout his childhood and spending much of his life without a permanent home, Young

---

[1] Although the Notice of Appeal cites both the district court's opinion and order dismissing the Metro Government and the Louisville Police Chief and the opinion and order granting summary judgment to the officers, the Estate discusses only the summary judgment order in its brief. Therefore, we will not consider the district court's dismissal of the Metro Government and the Louisville Police Chief. *See, e.g.*, *Bose v. Bea*, 947 F.3d 983, 993 (6th Cir. 2020).

had squatted in the abandoned house for years. On the night of February 11, Young had retreated to the second floor again after local residents had threatened him.

As Young hid on the second floor, the officers determined that they should enter the house to continue their search for the alleged burglary suspect. The call for officers to assist at the scene labeled the incident a "break-in in-progress," but there is some evidence that one officer on the scene, Michael Roberson, was uncertain about whether there had been a break-in at all. The videos suggest that, before entering the house, Officers Russell Braun and Paige Young may have remembered encountering Young at the house months earlier. While still outside, Braun told the other officers about a man he had encountered there on a previous call, and he asked Officer Young if she "remember[ed] where this guy was last time." Officer Young had also said to other officers that the suspect might be the same man she had encountered at the house before and offered a physical description of Young. Officers Braun and Young would later confirm that they had previously encountered Young in that same house. A few months earlier, the officers found Young on the house's second floor and persuaded him to leave without incident.

Within fifteen minutes of beginning to unscrew the boarded-up door, Officer Braun gained entry to the house with help from other officers. He then requested a K-9 dog to search for the suspect in the house. When the K-9 officer refused to do so based on Department policy,[2] Officers Braun, Young, and Richardson drew their weapons to enter and search the home. As he walked in, Braun shouted into the house, "Police! If you're in here, let us know!" Braun then announced the officers' presence in the house three additional times.

While Officer Braun positioned himself at the bottom of the stairs, Officers Young and Richardson searched the rooms on the first floor with their weapons drawn and flashlights in hand.

---

[2] The parties dispute the exact reason that the K-9 dog was not deployed. Ultimately, the reason for this decision is immaterial to our decision in this appeal.

Officer Young recounted later that she heard movement overhead as she searched. When the first-floor search yielded no results, the officers lined up with guns drawn at the foot of the stairs to continue the search on the next floor.

Officer Braun led the line toward the second floor. As he preceded up the stairs, he shouted, "Police Department!" and, about halfway up the stairs, "Police!" As Officer Braun came closer to the top of the stairs, a scan of the landing between the stair bannisters did not reveal anyone in the second-floor common area. However, as Officer Braun reached the top of the stairs and turned around, the beam of his light revealed Young crouching in a corner about ten feet away. Young got to his feet, holding a metallic object with a handle, which both parties describe as a "metal skewer." Young moved decisively toward Braun with the skewer pointed at the officer's body. The officers immediately shouted at Young, who continued to move forward with the skewer. Less than three seconds after the officers saw Young, all three officers fired on him. Young immediately fell to the ground. He died of multiple gunshot wounds several minutes later.

Reinella Kirilova, Young's mother and then-administratrix of his estate, sued the Louisville Metro Government, Chief of Police Steve Conrad, and the three officers involved in the shooting—Braun, Young, and Richardson. The Amended Complaint brought federal claims pursuant to 42 U.S.C. § 1983 alleging that the shooting violated Young's rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and state-law claims of negligence, gross negligence, battery, and wrongful death. The amended complaint alleges that Braun, Richardson, and Young's method of searching the house unnecessarily exposed themselves to greater risk.

In July 2018, the district court granted Louisville Metro Government's and Police Chief Steve Conrad's motions to dismiss. In January 2019, Christopher Hall, Young's brother, replaced

Kirilova as the administrator of Young's estate, and in March 2019, the district court substituted him as the plaintiff and real party in interest in the case. After discovery, the district court granted summary judgment to the officers, concluding that they were entitled to qualified immunity because they acted reasonably in responding to Young with lethal force. This timely appeal followed.

## II.   ANALYSIS

We review de novo the denial of a summary judgment motion based on qualified immunity and view the facts in the light most favorable to the nonmovant. *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015). To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, we view them in the light depicted in the videos. *See Harris*, 550 U.S. at 380. To the extent that facts shown in videos can be interpreted in multiple ways, or if videos do not show all relevant facts, such facts are viewed in the light most favorable to the non-moving party. *See Godawa*, 798 F.3d at 463.

The district court also granted summary judgment to the officers on the state-law claims. As with the federal claims, "[w]e review the district court's grant of summary judgment de novo." *Wilson v. Gregory*, 3 F.4th 844, 855 (6th Cir. 2021) (quoting *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020)). A party is entitled to summary judgment if it shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to "show[] the absence of a genuine dispute of material fact as to at least one essential element" of each claim for which it seeks summary judgment. *Troutman*, 979 F.3d at 481 (quoting *Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 835 (6th Cir. 2012)).

### A.    The Fourth Amendment Claim

Young's Estate asserts that the district court erred in granting summary judgment to Officers Braun, Young, and Richardson based on qualified immunity.  Qualified immunity "shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A public official is entitled to qualified immunity unless the plaintiff shows: (1) a constitutional violation and (2) that the violated constitutional right was "clearly established" when the violation occurred.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Both prongs are necessary, and if either one is unsatisfied, then the officer is entitled to qualified immunity.  *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).  To overcome the presumption of qualified immunity for officers, "the plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact'; that is, 'evidence on which [a] jury could reasonably find for the plaintiff.'"  *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

We first consider whether the officers violated Young's constitutional rights on the night of February 11, 2017.  The Estate argues that the officers' use of deadly force against Young was a violation of his Fourth Amendment rights.  The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive force by law enforcement officers and governs our analysis.  While officers may use some degree of physical coercion, the Fourth Amendment requires the amount of force to be objectively reasonable under the totality of the circumstances.  *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

The objective reasonableness inquiry is considered from the perspective of a hypothetical reasonable officer in the defendant's position and with his knowledge at the time, but without

regard to the officer's subjective intent in taking the actions. *Id.* at 397. The Supreme Court has emphasized that we cannot deploy "the 20/20 vision of hindsight," *id.* at 396, because officers may be placed in tense and evolving situations requiring split-second decisions concerning the amount of force that is necessary, *id.* at 396–97. Therefore, the reasonableness analysis provides a "built-in measure of deference to the officer's on-the-spot judgment." *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (quoting *Burchett v. Kierfer*, 310 F.3d 937, 944 (6th Cir. 2002)). We must not, however, allow "[t]he fact that a situation unfolds quickly" to blindly permit officers to use deadly force. *Id.* at 766. Instead, qualified immunity for deadly force is permissible "only where officers make split-second decisions in the face of serious physical threats to themselves and others." *Id.* at 766–67.

This reasonableness inquiry requires us to carefully balance Young's Fourth Amendment interests against the governmental interests at play. *Graham*, 490 U.S. at 396. For this claim, Young's Estate bears the burden of proof to show that the officers used excessive force, or to show that the force used was unreasonable under all the circumstances. *Miller v. Taylor*, 877 F.2d 469, 472 (6th Cir. 1989). Three non-exhaustive factors from *Graham* guide the analysis of a deadly force claim: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 396). Ultimately, our focus is on whether "the totality of the circumstances justified a particular sort of search or seizure." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

The first and third *Graham* factors have little relevance to our analysis. Viewed in the light most favorable to Young's Estate, the original crime under investigation was at most burglary and at a minimum trespassing. But at least one officer indicated some doubts about the burglary report.

The record is unclear if the officers were even planning to make an arrest or were simply searching for a suspect to ask questions about the alleged break-in. Furthermore, there is no evidence that the officers were attempting to arrest Young or that Young's actions were intended to resist or evade arrest. The question, then, is whether Young posed an immediate safety threat such that the officers were reasonable in firing their weapons. *See Hood v. City of Columbus*, 827 F. App'x 464, 469 (6th Cir. 2020).

Young's Estate argues that the totality of the circumstances, including the officers' decision to ascend the stairs to the second floor and continue their search, demonstrates that the officers' use of deadly force was unreasonable. Rather than just the confrontation between Young and the officers, the Estate urges us to consider the officers' "decision to aggressively force an immediate confrontation with Mr. Young with only their handguns at the ready." The Estate also questions multiple decisions made before the officers climbed the stairs to the second floor, including their decision not to follow Louisville Metro Government policies on barricaded subjects and dealing with persons with diminished capacity. As the Estate points out, there was some circumstantial evidence that the individual in the house was mentally ill or had diminished capacity, including Young's failure to respond to officers, his retreat into the abandoned house, and the officers' suggestion that they may have encountered Young in the house before.

We have held, however, that "[w]ithin a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed." *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005). Though different decisions on the night of February 11, 2017, might have led to a better outcome, the record does not support an obvious causal connection between those alleged oversights and the officers' decision to use force against a previously hidden and threatening Young. *See Harris v.*

*City of Circleville*, 583 F.3d 356, 365 (6th Cir. 2009) (citing *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) ("In assessing the reasonableness of the Officers' actions, we analyze the events in segments."). Our precedent generally requires the excessive force analysis to focus on the moments immediately leading up to the use of force, which indicates the need for allegations and evidence that the immediately preceding conduct is part of the same event. *Id.*; *Hood*, 827 F. App'x at 469; *see also Russo v. City of Cincinnati*, 953 F.2d 1036, 1044–45 (6th Cir. 1992) (analyzing separately three excessive force claims arising from the same incident). Due to the fact-intensive nature of excessive force claims, precise guidelines on what constitutes an analyzable unit of time for a particular event are absent from our cases. But our precedent shows that some causal connection between the preceding seconds or minutes to be included in the claim and the actual use of force is necessary. *See, e.g.*, *Dickerson v. McClellan*, 101 F.3d 1151, 1161–62 (6th Cir. 1996); *Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir. 1990). Here, the record does not support the conclusion that the officers' decision to enter the house to conduct a lawful search, and to continue that search on the second floor, is so "conceptually [in]distinct" from the deadly force used that they should be analyzed as one "segment." *Dickerson*, 101 F.3d at 1162; *Harris*, 583 F.3d at 365.

Furthermore, the fact that a suspect has a disability is relevant to the use of force analysis, but only if the officers were aware that some disability exists. *See Gaddis v. Redford Twp.*, 364 F.3d 763, 775 (6th Cir. 2004); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) ("It cannot be forgotten that the police were confronting an individual whom they knew to be mentally ill or retarded, even though the Officers may not have known the full extent of [his] autism and his unresponsiveness."). Here, the string of inferences necessary to conclude that the officers were actually aware that it was Young on the second floor and that Young suffered

from mental illness that required treating him as an individual with diminished capacity is too attenuated. Thus, that Young suffered from mental illness also does not impact our analysis.

Instead, we must consider the video evidence showing that, as the officers reached the top of the stairs, Young stepped determinedly toward Officer Braun with a metal skewer in his hand pointed toward the officer's body. These facts place the officers' use of deadly force on the "reasonable" side of our excessive force cases. This is not a case in which officers used force against an already subdued suspect. *See, e.g.*, *Bouggess v. Mattingly*, 482 F.3d 886, 895–96 (6th Cir. 2007). Nor is it a situation in which we must be wary of the self-serving accounts of police officers. *See, e.g.*, *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010). Though Young cannot provide his own version of the events, the body camera footage does provide a more objective understanding of that night's events. The video shows that Young was hidden from view—even with the banister railings providing some sightline to the second-floor landing—until Officer Braun turned around at the top of the stairs and Young came toward him.

This focused analysis on the shooting does not expand what we consider a reasonable use of deadly force. The officers argue that our prior decisions in *Baker v. City of Trenton*, 936 F.3d 523 (6th Cir. 2019), and *Livermore v. Lubelan*, 476 F.3d 397 (6th Cir. 2007), dictate that our inquiry consider only the officers' decisions in the few seconds immediately preceding the use of lethal force and must result in a finding of reasonableness. Those cases, however, are too factually distinct to offer much guidance here, and their logic does not underlie our focused analysis. In *Baker*, the threat was known to officers for "several minutes" before they used deadly force: a teenager who had allegedly harmed his mother and earlier refused the officers' orders, lunged at officers with a lawnmower blade, striking an officer who had fallen on the stairs trying to retreat. *Baker*, 936 F.3d at 528–29. We therefore concluded that the fallen officer acted reasonably in

shooting the teenager after the teenager had already wounded him. *Id.* at 533. *Livermore* is even less apposite. There we rejected a plaintiff's excessive force claim against an officer who fired on a suspect from a sniper position. *Livermore*, 476 F.3d at 404. The threat from the suspect was clear and longstanding: he had set buildings on his property ablaze while in an armed stand-off with officers, shot at a news helicopter, and exited his residence armed with a rifle. *Id.* at 404–05. We concluded that even if the suspect was not, as the officer contended, aiming at other nearby officers with his rifle, the use of force was reasonable because the suspect's previous actions showed that he posed a serious threat to those nearby officers. *Id.* at 405. In contrast, Young's threat to the officers became apparent only when he advanced on Officer Braun with the metal skewer, an object posing a less obvious danger than the lawnmower blade or shotgun. Additionally, the officers here had less notice of Young's possible intent to cause harm than the officers in *Baker* and *Livermore*, who had already witnessed the suspect's dangerous actions prior to their use of deadly force. *Baker* and *Livermore*, therefore, do not establish that the use of lethal force against Young was reasonable.

Our decision in *Chappell v. City of Cleveland* does offer some guidance. 585 F.3d 901 (6th Cir. 2009). There, the grandmother of a fifteen-year-old boy who died from a police shooting brought a § 1983 excessive force claim against the officers involved. *Id.* at 905. On appeal, we reversed the district court's denial of qualified immunity to the officers. *Id.* at 904. While executing a search warrant regarding a robbery and conducting a protective sweep of the boy's home, the officers found him hiding in a bedroom closet. *Id.* at 905. Upon the officers' orders, the boy emerged from the closet holding a knife in his raised hand, ignored commands to drop the knife, and continued moving toward the officers before they shot and killed him. *Id.* We concluded that "[t]he record affords no basis for holding that the [officers'] conduct was

objectively unreasonable under the circumstances they faced." *Id.* at 913. Here, as in *Chappell*, Young was armed with a weapon and moved suddenly and decisively toward an officer in a manner that a reasonable officer could view as aggressive. Young's failure to respond to police commands and his movement toward Officer Braun with the skewer pointed at Braun's body support the conclusion that, based on our precedent, he posed a serious risk to the officers.

In analogous cases in which we have found that an officer's use of deadly force was unreasonable, moreover, there is often evidence that the individual was attempting to obey police orders or was no longer a threat to the officers. In *Bletz v. Gribble*, for example, at issue was whether officers executing an arrest warrant used objectively unreasonable force when they fatally shot the arrestee's father who was pointing a gun at them from another room, asking that they identify themselves. 641 F.3d 743, 747 (6th Cir. 2011). We concluded that the factual dispute over whether the father was lowering his gun in response to the officers' verbal commands immediately before the shooting was sufficient to preclude summary judgment. *Id.* at 752. In contrast, video evidence of Young's death makes it clear that rather than lowering his weapon in response to the officers' presence, Young proceeded toward Officer Braun with the metal skewer pointed toward his torso.

Because it was not unreasonable for the officers to believe that Young was threatening an officer with death or serious injury, their use of deadly force was not a violation of Young's Fourth Amendment rights. Because we find no constitutional violation, we need not examine the second prong of qualified immunity. The district court was correct in granting summary judgment to the officers on the § 1983 excessive force claim.

B.    The State-Law Claims

The Estate also challenges the district court's dismissal of its state-law claims.  The Estate argues that the officers' conduct made them liable for battery, negligence, gross negligence, and negligence per se.  Our analysis of these claims overlaps with that of the Fourth Amendment claim.

Kentucky law defines a battery as "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him."  *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000) (quoting *Sigler v. Ralph*, 417 S.W.2d 239, 241 (Ky. 1967)). Officers receive official immunity—the state analogue of qualified immunity—from tort claims like battery if they performed "(1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of [their] authority."  *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).  An officer's "use of deadly force plainly falls within the scope of a police officer's authority," *Reich v. City of Elizabethtown*, 945 F.3d 968, 983 (6th Cir. 2019) (citing Ky. Rev. Stat. § 503.050(1)–(2)), and is a discretionary act, *id.* at 982 (citing *Nichols v. Bourbon Cnty. Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014)).  The burden, then, is on the Estate to show that the officers did not act in good faith.  Under Kentucky law, the Estate has two means of making such a showing: (1) pointing to a violation of a clearly established constitutional or statutory right or (2) evidence of the officers' willful or malicious intent to harm the plaintiff.  *Bryant v. Pulaski Cnty. Detention Ctr.*, 330 S.W.3d 461, 466 (Ky. 2011).  Our conclusion that the officers' use of deadly force was not objectively unreasonable eliminates the first option, and the Estate offers no evidence supporting a finding that the officers acted with willful or malicious intent to harm Young.  The Estate's battery claim thus fails.

The negligence and gross negligence claims are also not viable claims for the Estate. District courts in our Circuit have correctly recognized that an officer's use of force is "an intentional act of battery" that will not lead to liability if the officer "is clothed by a privilege

permitting him to use a reasonable amount of force." *Ali v. City of Louisville*, No. 3:05-cv-427, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006). A claim based on an officer's excessive force, therefore, is cognizable only as a battery claim. And "there is no such thing as a negligent battery." *Woodcock v. City of Bowling Green*, 165 F. Supp. 3d 563, 605 (W.D. Ky. 2016) (quoting *Ali*, 2006 WL 2663018, at *8), *rev'd on other grounds*, 79 F. App'x 419 (6th Cir. 2017).

The negligence per se claim also fails as a matter of law. Putting aside the question of whether this claim was properly and timely pleaded, the statute the Estate bases its claim on provides no cause of action here. Kentucky's negligence per se statute allows a plaintiff who is "injured by the violation of any statute" to recover damages. Ky. Rev. Stat. § 446.070. But while that section provides a private right of action, it does not reach every Kentucky statute. Such is the case with § 503.090, which provides an affirmative defense to police officers for an otherwise unlawful use of force. *See, e.g.*, *Browning v. Edmonson Cnty.*, 18 F.4th 516, 531 (6th Cir. 2021) (explaining that Ky. Rev. Stat. § 503.090(1) provides Kentucky officers with an "affirmative defense" in excessive force cases); *Clark v. Kentucky*, 229 F. Supp. 2d 718, 728–29 (E.D. Ky. 2002). Because this statute provides only available defenses for officers, rather than regulating their conduct, it cannot support a negligence per se claim. *See Anderson v. City of Fulton*, 5:18-cv-32, 2020 WL 7038580, at *12 (W.D. Ky. Nov. 30, 2020).

## III.  CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's grant of summary judgment in favor of all defendants.