RENDERED:  JULY 12, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0923-MR

KIMBERLY CARPENTER                                                        APPELLANT


APPEAL FROM FAYETTE CIRCUIT COURT
v.            HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 20-CI-00177


JUSTIN A. SAUNDERS, M.D.; JOHN
HILL SAUNDERS P.S.C. D/B/A
SAUNDERS OCULOPLASTIC
SURGERY, P.S.C.                                                            APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, ECKERLE, AND KAREM, JUDGES.

KAREM, JUDGE:  Kimberly Carpenter appeals from the circuit court's order

granting summary judgment in favor of her treating doctor in this informed consent

medical malpractice action.  Specifically, the circuit court found that Kimberly

Carpenter failed to provide any proof that her alleged lack of informed consent

caused her injuries.  We agree and affirm the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Kimberly Carpenter (Carpenter), age 33 at the time of the surgery in question, is a registered nurse who sought medical treatment in September of 2016 for what she believed was a droopy eyelid.  Upon examination, the doctor surmised she might be suffering from Silent Sinus Syndrome, or SSS.[1]  With this knowledge, Carpenter sought treatment with an ENT (an ears, nose, and throat specialist), Dr.

---

[1] According to the Cleveland Clinic:

> Silent Sinus Syndrome (SSS) is a health condition affecting [the] maxillary sinuses, which are nasal passages in [the] cheek area next to [the] nose.  The condition is characterized by a sunken eye (enophthalmos) and/or the downward displacement of [the] eyeball in [the] eye socket (hypoglobus).  This occurs due to the collapse of [the] sinus walls and orbital floor.  [The] orbital floor forms the roof of [the] maxillary sinus.
>
> The condition can happen when [the] sinuses get clogged.  Secretions build up in [the] sinuses and are then reabsorbed.  Over time, [this condition can create] a vacuum [causing the] sinuses [to] get smaller and smaller, leaving more room for [the] eyes to sink.
>
> Silent Sinus Syndrome doesn't usually cause any pain (that's where the silent part comes in), but it may make [the] face look asymmetrical.  It typically only affects one side of [the] face, but it can affect both.  Treatment is required to prevent worsening symptoms and complications, such as peripheral vision loss (tunnel vision).
>
> . . . .
>
> Silent sinus syndrome is rare.  The condition was first described in 1964, and since then, about 100 cases have been reported.

*Silent Sinus Syndrome*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/25192-silent-sinus-syndrome (last visited Jul. 1, 2024).

Keith Alexander (Dr. Alexander), who subsequently ordered a CT scan. After reviewing the results of the scan, Dr. Alexander noted the presence of an infection which caused Carpenter's eye to sink, thus confirming the diagnosis of SSS.

For treatment, Dr. Alexander proposed Carpenter undergo a combined two-part surgery. Dr. Alexander planned to perform a decompensation surgery to remove the infection and he referred Carpenter to Dr. Justin Saunders (Dr. Saunders), an ophthalmologist who specializes in oculoplastic surgery,[2] to then correct the position of the eye and complete the second part of the surgery.

Carpenter's first visit with Dr. Saunders was on November 15, 2016, wherein Dr. Saunders noted Carpenter's eye was inferiorly and posteriorly displaced, or sunken down and back. He recommended surgery to implant a wedge under the eye, creating a platform to move the eye up and forward. Dr. Saunders documented in his notes that he spent a considerable amount of time with Carpenter discussing potential complications that could result from the surgery including

---

[2] According to the Mayo Clinic:

> Oculoplastic and orbital surgeons are ophthalmologists who completed additional fellowship training in the medical and surgical management of a wide range of conditions affecting the structures that surround the eye, including the eyelids, eye socket (orbit) and tear drainage system.

*Oculoplastic and Orbital Surgery*, MAYO CLINIC, https://www.mayoclinic.org/departments-centers/oculoplastic-and-orbital-surgery/overview/ovc-20524322#:~:text=Oculoplastic%20and%20orbital%20surgeons%20are,orbit)%20and%20tear%20drainage%20system (last visited Jul. 1, 2024).

scarring, over/under correction, double vision, vision loss, and numbness along the right cheek. However, Carpenter asserts that the notes did not contain everything they discussed:

> I specifically asked him how many times he had done this surgery, if he had examples and pictures of patients he had done this surgery on before. I asked him when we talked about the type of implant to be used. We discussed size, my anatomy, would it be appropriate, and those – all those things are not mentioned in detail on this note.

Dr. Saunders did not provide photos of prior surgeries. And when Carpenter inquired as to the number of similar procedures that Dr. Saunders had performed on patients before her, he simply replied that he had experience. Lastly, Carpenter maintains that she left the appointment with an understanding that Dr. Saunders would have multiple sizes of wedges in the operating room from which he could choose to ensure the appropriate size wedge was implanted. Notably, it is undisputed that Carpenter signed a consent acknowledging her awareness of potential complications from surgery.

In fact, prior to the December 14, 2016 surgery, Carpenter signed a pre-operative "Consent to Operation, Administration of Anesthetics and Rendering of Medical Services," which stated:

> 1. You have talked with your physician and he/she has explained to your satisfaction the following: (1) the procedure(s); (2) the potential benefits, risks, or side effects, including potential problems that might occur during recuperation; (3) the likelihood of achieving

goals; (4) reasonable alternatives to procedure(s), if any; and (5) the relevant risks, benefits, and side effects related to the alternatives, including the possible results of not receiving care, treatment and service; (6) any limitations on the confidentiality of information learned from or about the patient. Based on your physicians' explanation of the benefits and risks of the procedure(s) and the alternatives available you are agreeing that the potential benefits of the procedure(s) outweigh the potential risks involved. Your physician has explained that all surgeries/procedures involve some risk. Risks can include severe loss of blood, infection, perforation, cardiac arrest, loss of vision, stroke, paralysis and, in rare circumstances, death. You understand that if complications occur, additional medical treatment may be required.

2. You are aware that in the practice of medicine, other unexpected risks or complications not discussed may occur. You also understand that during the course of the proposed procedure(s) unforeseen conditions may be revealed requiring the performance of additional procedures, and you authorize such procedures to be performed. You further acknowledge that no guarantees or promises have been made to you concerning the results of any procedure or treatment.

Subsequently, Carpenter underwent the combined double surgery as planned and it was initially deemed a success.

Over the next 26 months, Dr. Saunders saw Carpenter in his office on a number of occasions and telephoned her frequently to check on her progress. Notably, Carpenter did not experience any complications from the surgical procedure for the first seven months after the operation. However, during a follow-

-5-

up visit with Dr. Saunders on July 27, 2017, Carpenter complained of renewed symptoms. And, between February 23, 2018, and January 11, 2019, Carpenter underwent three additional surgical procedures with Dr. Saunders to address the appearance of her right eye and double vision. Ultimately, the implanted wedge was removed entirely.

Carpenter acknowledges that she understood the risks of scarring and complications that ultimately led to the removal of the implant. She even recognizes that the surgery was performed within the normal standard of care. However, Carpenter brought suit alleging negligent care and treatment due to a failure to obtain informed consent for the initial surgery. Specifically, she complains: 1) Dr. Saunders did not answer her question as to how many prior surgeries of the same type he had performed; and 2) he misled her as to the number of wedges that would be available during the surgery. She maintains that, had she been aware of these facts, she would never have consented to the surgery and thus would not have suffered any of the subsequent complications. In making her claim Carpenter provided expert testimony to establish Dr. Saunders violated the standard of care for obtaining informed consent by not answering Carpenter's experience question with a specific number of similar surgeries performed, in addition to misleading her as to the number of wedges available during surgery. However, the trial court found that Carpenter failed to carry her burden on the essential element

-6-

of causation and granted Dr. Saunders' summary judgment motion. This appeal followed.

## STANDARD OF REVIEW

"The standard of review on appeal of summary judgment is whether the trial court correctly found there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Carter v. Smith*, 366 S.W.3d 414, 419 (Ky. 2012). Under this standard, an action may be terminated "when no questions of material fact exist or when only one reasonable conclusion can be reached[.]" *Shelton v. Ky. Easter Seals Soc., Inc.*, 413 S.W.3d 901, 916 (Ky. 2013). Summary judgment involves only legal questions and the existence, or non-existence, of material facts are considered. *Stathers v. Garrard Cnty Bd. of Educ.*, 405 S.W.3d 473, 478 (Ky. App. 2012). Our review is *de novo*. *Mitchell v. Univ. of Ky.*, 366 S.W.3d 895, 898 (Ky. 2012).

## ANALYSIS

1. **Carpenter understood the risks and hazards of surgery**.

Turning to the substantive law of informed consent, "it is a well-established principle of law that, as an aspect of proper medical practice, physicians have a general duty to disclose to their patients in accordance with accepted medical standards the risks and benefits of the treatment to be performed." *Sargent v. Shaffer*, 467 S.W.3d 198, 206 (Ky. 2015), *overruled on other grounds by Univ.*

*Med. Ctr., Inc. v. Shwab*, 628 S.W.3d 112 (Ky. 2021). In pertinent part to the case

*sub judice*, KRS[3] 304.40-320 provides the informed consent standard:

> In any action brought for treating, examining, or operating on a claimant wherein the claimant's informed consent is an element, the claimant's informed consent shall be deemed to have been given where:
>
> (1) The action of the health care provider in obtaining the consent of the patient or another person authorized to give consent for the patient was in accordance with the accepted standard of medical or dental practice among members of the profession with similar training and experience; and
>
> (2) A reasonable individual, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedure and medically or dentally acceptable alternative procedures or treatments and substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among other health care providers who perform similar treatments or procedures . . . .

KRS 304.40-320(1)-(2).[4] The subsections of this statute are generally referred to as

pertaining to 1) process and 2) content. "Thus, to meet the requirements of the first

subsection the [patient] must show that the process by which the medical

defendants obtained her consent did not comply with 'accepted standards' within

---

[3] Kentucky Revised Statutes.

[4] KRS 304.40-320(3) provides requirements for obtaining informed consent in emergency situations; that subsection is inapplicable in this case. Thus, only the analysis of KRS 304.40-320(2) is necessary.

the medical profession." *Shwab*, 628 S.W.3d at 121. Carpenter's expert testified he had no issue with how consent was obtained, or in other words, the process by which consent was obtained. In arguments before the trial court, Carpenter reiterated the case *sub judice* is a "content only" case. Thus, we restrict our analysis to the second prong of the standard: content of the information provided to Carpenter for the purposes of obtaining informed consent for the surgery.

Carpenter's only expert opined that the scarring that resulted in multiple follow-up surgeries was accounted for in the consent Carpenter gave. His only criticism revolved around the knowledge Carpenter had of Dr. Saunders' experience and the number of implants available during the operation. In other words, he took exception to the content of the information provided to obtain informed consent and maintained that Dr. Saunders violated the second prong of the informed consent statute. Assuming, *arguendo*, this is in fact true, the analysis moves to whether the failure to provide the information in question caused the injury suffered by Carpenter.

"A negligence action requires proof of: (1) a duty on the part of the defendant; (2) a breach of that duty; and (3) a consequent injury, which consists of actual injury or harm, plus legal causation linking the defendant's breach with the plaintiff's injury." *Hugenberg v. West American Ins. Company/Ohio Cas. Group*, 249 S.W.3d 174, 181 (Ky. App. 2006). Dr. Saunders clearly had a duty to obtain

informed consent.  And Carpenter admits that the complications she endured as a result of surgery were explained to her and she provided the necessary prior consent in relation to those complications.  There is no evidence that the information she claims to have lacked when providing consent caused the injuries of which she now complains.  There is ample evidence in the record supporting the fact that Dr. Saunders explained the potential complications that could result from the surgery including scarring, over/under correction, double vision, vision loss, and numbness along the right cheek.  It was in fact, and all parties agree, one or more of these complications which necessitated multiple follow-up surgeries and the ultimate removal of the implanted wedge.  We agree with the trial court that Carpenter, as a matter of law, has failed to carry her burden of presenting evidence sufficient to create a genuine issue of material fact on the essential element of causation.

2. **Carpenter maintains she would not have approved of Dr. Saunders performing her surgery had he been forthright with her**.

Historically, informed consent medical malpractice cases have focused on doctors obtaining consent but failing to disclose the risk of treatment to the patient.  For example, in a case from the 1970s, "the plaintiff alleged that a physician had failed to disclose a risk which he had known to exist, or had failed to inform her of the risks of a medical procedure to the same degree as physicians of ordinary prudence and skill would have done." *Keel v. St. Elizabeth Med. Ctr.*, 842

-10-

S.W.2d 860, 861 (Ky. 1992) (citing *Holton v. Pfingst*, 534 S.W.2d 786, 788 (Ky. 1975), *superseded by statute as stated in Sargent*, 467 S.W.3d at 207).

Carpenter's claims differ greatly from the historical context of informed consent medical malpractice cases. By Carpenter's own admission she was, prior to the surgery, advised of all the complications of which she suffered following surgery. However, she maintains she would not have allowed *Dr. Saunders* to operate had he provided her with the information she requested. The Supreme Court faced a similar issue when analyzing an informed consent medical malpractice claim in *Vitale v. Henchey*, 24 S.W.3d 651, 654 (Ky. 2000).

Maurice Henchey, who held a medical power of attorney for his mother, gave consent for surgery on his mother to remove a blood clot. After conferring with her treating doctor, Dr. Donald Varga, and surgical consultant Dr. Athel Sparrow, two surgeons were identified who could perform the required surgery, Dr. Thomas Wieman, and his partner Dr. Gary Vitale. Dr. Sparrow felt it was ill-advised to use Dr. Vitale as he was "too aggressive [and] not compassionate[.]" *Id.* (quoting one of the defendant physicians). Henchey subsequently agreed to allow Dr. Wieman to perform the surgery. Unknown to Henchey, however, Dr. Vitale performed the surgery due to a scheduling conflict with Dr. Wieman. Later that evening, Henchey's mother's condition worsened requiring yet another surgery, again performed by Dr. Vitale. Unfortunately,

-11-

Henchey's mother died the following day. Henchey then brought suit alleging he never gave consent for surgery to be performed by *Dr. Vitale*.

> Henchey testified that he was not informed about the change in surgeons and he believed Drs. Wieman and Sparrow would perform the surgeries which were actually performed by Dr. Vitale. Henchey further testified that, based on Dr. Sparrow's comments to him about Dr. Vitale, he would not have consented to Dr. Vitale performing the surgeries on his mother. Henchey denied the physicians' contention that consents authorizing Dr. Vitale to perform the November 6 surgeries were read to him over the phone and that he gave a blanket consent for those surgeries.

*Id.* at 654.

The Supreme Court ultimately held that negligence caselaw, together with Kentucky's informed consent statute, were inapplicable to the case. Henchey was well aware of the risks and hazards of the procedure and gave valid consent for the surgeries to proceed. Rather, the Court found that Henchey's claim was one of battery.

> [T]he physicians, [and the] trial court, confused the issue of *informed* consent, i.e., the failure to disclose a risk or hazard of the surgeries, with the issue of *no* consent, or whether *any valid* consent was obtained prior to Dr. Vitale's performance of the surgeries. *Holton* and the Kentucky Informed Consent Statute do not apply when surgery is performed without the patient's consent and Henchey's claim here is based on the lack of consent for Dr. Vitale to perform the surgeries. Henchey testified at trial that he gave his consent to surgeries which were to be performed by Drs. Wieman and Sparrow, but did not give his consent to Dr. Vitale's performance of those

-12-

surgeries. Henchey's claim does not allege that the physicians did not advise him of the risks inherent in the surgeries, nor does he even suggest that Dr. Vitale improperly performed the surgeries. Consequently, *Holton* and the Kentucky Informed Consent Statute do not apply. Henchey alleges that he did not, and would not have, consented to Dr. Vitale performing the surgeries. This is not a claim for negligence, but for battery.

*Id.* at 656.

Similarly, Carpenter has conflated the law governing informed consent with that of battery. By her own admission she understood the risks of surgery and gave consent after being fully advised of potential complications. To the extent that she maintains, with 20/20 hindsight, she would not have given *Dr. Saunders* permission to operate, her claim falls more in line with battery if any claim exists at all and her claim for negligence was properly dismissed.

## CONCLUSION

Accordingly, for the foregoing reasons, we affirm the decision of the Fayette Circuit Court.

ALL CONCUR.

-13-

BRIEFS FOR APPELLANT:

Escum L. "Trey" Moore, III
Lexington, Kentucky

BRIEF FOR APPELLEES:

Carl D. Edwards
Lexington, Kentucky

Christopher B. Rambicure
Louisville, Kentucky