**Eva HOOFNEL, Appellant,**

v.

**James SEGAL, M.D. and Susan Galandiuk, M.D., Appellees.**

**No. 2004–SC–0381–DG.**

Supreme Court of Kentucky.

June 15, 2006.

Rehearing Denied Sept. 21, 2006.

Kevin C. Burke, Jason R. Segeleon, Louisville, Counsel for Appellant.

Gerald R. Toner, Donald K. Brown, Jr., Cathleen Charters Palmer, O'Bryan, Brown & Toner, Louisville, Counsel for Appellees.

GRAVES, Justice.

This appeal is from a summary judgment granted to Appellees, Drs. James Segal and Susan Galandiuk, in a medical battery claim arising out of a scheduled surgery to treat Appellant Eva Hoofnel's colorectal cancer. Even though Appellant admitted the medical necessity of removing her ovaries and uterus during the surgical procedure, Appellant alleges she did not consent for the removal of these organs.[1] The Jefferson Circuit Court entered summary judgment in favor of Appellees. The Court of Appeals affirmed, and we granted review. We affirm; however for reasons different from those of the lower courts.

On January 2, 2001, Appellant met with Dr. Galandiuk regarding the surgical removal of a lesion in her lower colon. The parties agreed that Dr. Galandiuk would perform a low anterior resection of the colon and an appendectomy. Dr. Galan-

---

1. Contrary to the dissent's assertion that no such admission was made, during oral argument, counsel for Appellant states, "we do concede that the procedure was medically appropriate, medically necessary." 11:25:45

diuk also recommended that Appellant undergo an oophorectomy to remove her ovaries, and a hysterectomy to remove her uterus. At this time, Appellant stated that she did not want her uterus or ovaries removed.

On January 5, 2001, Appellant underwent pre-operative testing at Norton Hospital where she met with a member of the hospital's nursing staff who described the risks of the surgical procedure scheduled for January 17, 2001. Appellant signed a "Consent to Operation" form. This consent form states that Dr. Galandiuk explained in layman's terms the nature and risks of the surgical procedures. In handwriting, the consent form recites that the procedures to be performed are an "anterior resection colon with appendectomy and possible bilateral oophorectomy." The consent form also contains the following paragraph authorizing additional procedures that may be medically necessary:

I understand that, during the course of the procedure(s) or operation(s), unforeseen conditions may require additional or different procedures than those listed above. I, therefore, authorize and request that the above-named physician, his/her associates, assistants, or consultants, perform such additional procedures as are deemed necessary in their professional judgment. This may include, but is not limited to, procedures involving pathology and radiology.

In her deposition, Dr. Galandiuk testified that Appellant verbally consented to an oophorectomy and hysterectomy provided Dr. Galandiuk felt that such additional procedures were medically necessary. Appellant denies giving verbal consent. During the surgery, Dr. Galandiuk discovered an abnormally large uterus which impaired her ability to resect the lesion in the colon. Appellant's uterus was pressing on the front wall of the rectum where the lesion was to be excised. Because Dr. Galandiuk believed that the uterus may have been cancerous, she consulted with Dr. Segal, a gynecologist, during the operation.[2] Dr. Segal observed the uterus and ovaries and agreed that they may be cancerous.

In his deposition Dr. Segal testified that the uterus contained multiple fibroid tumors and that Dr. Galandiuk could not have properly completed the colon resection without removal of the abnormally large uterus. In reviewing Appellant's consent form he noticed that a hysterectomy was not a specifically listed procedure. Dr. Galandiuk and her nurse advised Dr. Segal that Appellant gave her conditional consent for a hysterectomy. Unable to contact a member of Appellant's family to confirm the consent, Dr. Segal performed the oophorectomy and hysterectomy.

The Jefferson Circuit Court granted Appellees' motion for summary judgment, and held that the consent to operate form was indisputable evidence that Appellant gave Appellees consent to perform the procedures. The trial court concluded, as a matter of law, that this consent defeated Appellant's battery claim. Appellant moved to vacate the trial court's opinion, arguing that her signature on the consent form was not dispositive on the issue of consent, and that consent is a process that takes into account preoperative discussions. Although the trial court agreed with Appellant on this point, it nevertheless denied her motion to vacate. It held that lack of consent was "inextricably woven together" with lack of informed con-

---

**2.** In her deposition, Dr. Galadiuk was asked, "Did you have concerns that the ovaries and uterus may be cancerous as well?" She responded, "I was concerned... I wanted an expert opinion." Pg. 39.

sent, and as such, Appellant failed to present expert testimony to negate informed consent. That is, Appellant failed to offer testimony concerning the language that should have been used in the consent form.

The Court of Appeals affirmed the trial court and held that, under the facts of the case, no reasonable person would have refused consent to the removal of the uterus and ovaries. The Court of Appeals found that under the circumstances consent was implied for removal of the uterus and ovaries.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. CR 56.03; *Steelvest, Inc. v. Scansteel Service Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky.1991). We must view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, supra.*

■■■ In our analysis, it is important to differentiate the concept of medical malpractice/negligence from the concept of a medical battery. In *Vitale v. Henchey*, 24 S.W.3d 651 (Ky.2000), this Court distinguished a medical battery claim from a negligence claim. Without repeating the analysis of *Vitale*, again we simply state that medical battery is an intentional tort, and as such, it contains all of the essential elements of a common law claim of battery. *Id.* at 657. In this appeal, the element upon which summary judgment was granted is consent. A plaintiff must prove lack of consent as an essential element of

battery. *Id.* at 658 (citing Restatement 2nd, Torts § 13, Comment d). Consent may be either expressed or implied from the circumstances.[3] *Id.* An exception to the consent requirement is an emergency or life threatening situation. *Vitale, supra,* at 659.

■■■ In this case we must determine whether the consent form that Appellant signed prior to her surgery created a valid consent to the oophorectomy and hysterectomy, and if so, whether a genuine issue of fact remains on the consent issue. In *Kovacs v. Freeman*, 957 S.W.2d 251 (Ky. 1997), this Court explained the nature and role of a consent form for medical procedures. We held that consent is a process, and the consent form is a component of this process. *Id.* at 254–55. We stated, "valid consent to medical treatment is to be gleaned from evidence of the circumstances and discussions surrounding the consent process." *Id.* (citing *Haywood, supra* ).

In examining the consent form signed by Appellant, we find that it confirms her consent to the oophorectomy and the hysterectomy. The form specifically names a "possible bilateral oophorectomy" as a surgical procedure. The form also authorizes procedures "as are deemed necessary" in the treating physicians' professional judgment. This clause gave Dr. Galandiuk consent to perform the hysterectomy to remove Appellant's uterus as it was abnormally large secondary to fibroids, potentially cancerous, and was impairing and impeding the sur-

---

**3.** *Vitale, supra,* at 659. The Court of Appeals opinion, as Judge Johnson notes in his dissent, incorrectly extends the notion of implied consent to include whether a reasonable person in the patient's situation would consent. The correct inquiry regarding implied consent is whether the particular patient implicitly manifested consent. The Court in *Haywood v. Allen*, 406 S.W.2d 721 (Ky.1966), held that a patient had given her implied consent to a procedure where the procedure had been discussed between the parties and there was a "tacit understanding" that it would be performed.

geon's ability to resect the lesion in her colon.

We find the signed consent form to be clear evidence that summary judgment was proper. In evaluating consent in light of the circumstances and discussions surrounding the consent process, we do not believe that these circumstances create a genuine issue of material fact. Although in *Kovacs* we held that a consent form is not conclusive on the issue of consent, this is not to say that a consent form carries no weight at all.

The *Kovacs* opinion discusses *Lewis v. Kenady*, 894 S.W.2d 619 (Ky.1994). In *Lewis*, the plaintiff signed a consent form authorizing a mastectomy, but was permitted to introduce testimony that her authorization was orally conditioned upon a positive biopsy. *Id.* at 620, 622; *Kovacs, supra*, at 255. There, the circumstances and discussions surrounding consent elaborated upon a condition to the consent form, namely a confirmation of pathology.

There is a trend toward holding that consent evidenced in writing is conclusively presumed to be a valid consent in the absence of a valid collateral challenge. *See Parikh v. Cunningham*, 493 So.2d 999, 1001 (Fla.1986); *Cardio TVP Surgical Assoc. v. Gillis*, 272 Ga. 404, 528 S.E.2d 785, 787 (2000); *Snyder v. Ash*, 72 Ohio App.3d 795, 596 N.E.2d 518 (1991); *Lugenbuhl v. Dowling*, 701 So.2d 447, 450 (La.1997); *Piedra v. J.M. Dugan*, 123 Cal.App.4th 1483, 21 Cal.Rptr.3d 36 (2004). This presumption has been applied even where the consent form describes the procedures in medical terms (not laymen's terms) or refers to "such additional operations or procedures as are considered therapeutically necessary on the basis of findings during the course of said operation." *Hutcheson v. McGoogan*, 162 Ga.App. 657, 292 S.E.2d 527 (1982) ("The finding is bound by his

written consent."); *Watson v. Worthy*, 151 Ga.App. 131, 259 S.E.2d 138, 139 (1979).

In the instant case, Appellant has not presented sufficient evidence to rebut, or to distinguish the clear and unambiguous words of the consent form. Rather, Appellant acknowledges that she signed the consent form, but the essence of her argument is that she did not actually intend for her signature to grant consent. Appellant testified that she told Dr. Galandiuk, during an initial consultation, that she did not want her ovaries or uterus removed. Even assuming this conversation to be accurate, her signature on the consent form directly authorized one of these procedures and thus superseded this previous intention. The additional surgical procedure to remove the uterus became medically necessary once the enlarged uterus was observed as it impaired and impeded Dr. Galandiuk's ability to resect the lesion in the colon. The existence of a signed consent form gives rise to a presumption that patients ordinarily read and take whatever other measures are necessary to understand the nature, terms and general meaning of consent. To hold otherwise would negate the legal significance to written consent forms signed by the patient and render the consent form completely unreliable.

The order of the Jefferson Circuit Court granting summary judgment is affirmed.

LAMBERT, C.J., GRAVES, JOHNSTONE, ROACH, and SCOTT, J.J., concur.

COOPER, J., dissents in a separate opinion in which WINTERSHEIMER, J., joins.

COOPER, Justice, dissenting.

The majority opinion affirms a summary judgment entered by the trial court. Because the majority opinion misstates cer-

tain material facts that are in the record and assumes other facts that are not in the record, it is appropriate to remember the standard by which summary judgments are reviewed.

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. CR 56.03. The motion may be granted only if it would be impossible for the respondent to prevail at trial. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky. 1991). The record must be viewed in a light most favorable to the respondent and all doubts are to be resolved in the respondent's favor. *Id.* That includes all doubts as to the existence of questions of fact. *Tillery v. Louisville & Nashville R.R. Co.,* 433 S.W.2d 623, 624 (Ky.1968); *Estell v. Barrickman,* 571 S.W.2d 650, 653 (Ky.App. 1978). In ruling on a motion for summary judgment, it is the role of the judge to determine whether issues of fact exist, not to resolve them. *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.,* 814 S.W.2d 273, 276 (Ky.1991). Summary judgment is inappropriate where, "although the facts and evidence thus far developed do not establish the existence of a genuine issue of material fact, . . . neither do they establish the non-existence of such an issue." *Paintsville Hosp. Co. v. Rose,* 683 S.W.2d 255, 256 (Ky.1985) (quotation omitted).

Appellant, Eva Hoofnel, brought this action in battery against the Appellees, Dr. Susan Galandiuk, a colorectal surgeon, and Dr. James Segal, an obstetrician and gynecologist, seeking damages for the unauthorized removal of her uterus and ovaries during surgery deemed necessary in order to remove a tumor from her colon. The evidence on which summary judgment was premised consists of (1) the depositions of Hoofnel, Galandiuk, Segal, and Carolyn Gowan, a nurse anesthetist; (2) answers to interrogatories and requests for admissions filed by both Galandiuk and Segal; and (3) Dr. Galandiuk's operative report.

Appellant, then age 56 and with less than a high school education, was referred to Dr. Galandiuk for the removal of a tumor from the lower anterior portion of her colon. On January 2, 2001, Hoofnel met with Dr. Galandiuk and a surgical resident, Dr. William Rudolph, at Dr. Galandiuk's office. Galandiuk testified by deposition that, because the removal of the tumor from Hoofnel's colon required abdominal surgery, she recommended to Hoofnel that she also surgically remove Hoofnel's appendix, uterus, and ovaries (appendectomy, hysterectomy, and bilateral oophorectomy). Hoofnel testified that she agreed to the appendectomy, did not agree to the hysterectomy, and that removal of her ovaries was never discussed (perhaps because Dr. Galandiuk did not explain to her the meaning of the word "oophorectomy"). Specifically, Hoofnel testified that she told Galandiuk that she "did not want any of my female parts removed." Galandiuk wrote in her notes:

I had talked with her about oophorectomy and she wishes not to pursue that. I have discussed with her the possible need for hysterectomy *should there be tumor involvement* and I've also discussed with her doing incidental appendectomy, which she wishes to be done.

(Emphasis added.) Dr. Rudolph's notes reflect, *inter alia:* "Of note, the patient does not wish her ovaries removed, but we will do an appendectomy along with the low anterior resection."

On January 5, 2001, Hoofnel reported to Norton Hospital for a preoperative workup. While there, she signed the "Consent to Operation" form which the majority opinion concludes entitles Galandiuk and Segal to summary judgments. That con-

sent form reads in pertinent part (handwritten portions underlined):

1. I hereby authorize Dr. Galandiuk and/or such associates, assistants and consultants as may be selected by him/her to perform the following procedures or operations upon me (my child). Description of procedure in layman's terms:

anterior resection colon with appendectomy and possible bilateral oophorectomy

2. Dr. Galandiuk has explained to me in terms I understand the following information:

A. The basic nature of the procedure(s) or operation(s) listed above;

B. The substantial risks and hazards of the procedure(s) or operation(s);

C. Alternative procedures or treatments; and

D. The probable outcome should the procedure(s) or operations(s) not be performed.

Both Dr. Galandiuk and Dr. Segal admitted that the description of the procedures on the consent form were not in "layman's terms." Hoofnel testified that she has "no clue" what the word "oophorectomy" means. Contrary to the assertion in the majority opinion that Hoofnel "underwent pre-operative testing at Norton Hospital where she met with Dr. Galandiuk's nurse practitioner who described the risks of the surgical procedure," *ante*, at 149, Dr. Galandiuk testified that someone from her office contacted someone at the hospital by telephone and informed that person what procedures Dr. Galandiuk intended to perform and that the "[d]escription of procedure in layman's terms" would have been added to the consent form based on that information. She admitted that she did not talk to Hoofnel during the period between the office visit on January 2, 2001, and the day of the surgery, January 17, 2001. She did not attempt to explain why the consent form contained the words "possible oophorectomy," but did testify that she had originally recommended the oophorectomy to Hoofnel because colon cancer sometimes spreads to the ovaries. Finally, although the consent form states that "Dr. Galandiuk has explained to me in terms I understand the following information," Galandiuk testified that she relies on hospital personnel to explain that information to the patient.

There exists a factual dispute as to whether Hoofnel verbally consented to the hysterectomy and oophorectomy immediately prior to the surgery. Nurse Gowan testified that when Hoofnel arrived at the preoperative area, she asked Hoofnel what procedures were to be performed and Hoofnel responded, "colon surgery and a hysterectomy." Gowan stated that she was surprised by this response because she knew that Dr. Galandiuk does not do hysterectomies. (Dr. Galandiuk, however, testified that she frequently performs both hysterectomies and oophorectomies.) According to Gowan, when she informed Hoofnel that Dr. Galandiuk does not do hysterectomies, Hoofnel became angry and insisted that "all of those things be done at the same time." Since there was no signed consent to a hysterectomy, Gowan paged Dr. Galandiuk, who advised Hoofnel in Gowan's presence that she would only do a hysterectomy if it was "medically necessary."

Dr. Galandiuk's version of this conversation is that Hoofnel said: "I want you to take my ovaries out. I want you to do a hysterectomy. I want you to do everything that's necessary, if you feel it's necessary."

Hoofnel's version is that when she entered the preoperative area, Gowan asked her, "You are here for appendix and co-

lon?" Hoofnel responded, "Yes," then took a pill given to her by Gowan and remembers nothing else until she awakened in the recovery room. She denies any conversation with Dr. Galandiuk on the day of the surgery. It was Dr. Segal who told her that he had removed her uterus and ovaries. After the surgery, Dr. Galandiuk made the following handwritten entry in her office notes: "1/17/01—discussed w/ pt—she does indeed wish ovaries removed." But even this belated entry does not reflect a consent to the hysterectomy.

Although Dr. Galandiuk testified that she found Hoofnel's uterus and ovaries to be "grossly enlarged," her operative report does not mention the word "uterus" and only states with respect to the ovaries:

> The patient's ovaries and fallopian tubes appeared normal. However, there were several endometrial fibroids including one very large one. We asked Dr. Shaffer [sic] of gynecology to take a look in. He felt because of the size of the mass that total abdominal hysterectomy was indicated.

Contrary to the statement made in the majority opinion, Dr. Galandiuk did not testify and her operative report does not reflect that she "believed the uterus may have been cancerous." *Ante,* at 149. In her answers to interrogatories, Dr. Galandiuk stated that Dr. Segal "made the determination that Plaintiff needed a hysterectomy and oophorectomy." Dr. Segal's version is substantially different.

Dr. Segal testified that on January 17, 2001, he was paged for a surgical consultation and proceeded to the operating room where Dr. Galandiuk's surgery on Hoofnel was in progress. He testified that Dr. Galandiuk told him that Hoofnel "had requested that, if her uterus was abnormal, that it be removed ... [a]nd she asked me

if her uterus was abnormal." Dr. Segal testified that Hoofnel's uterus was "abnormal" because it was more than double the normal size of the uterus of a 56–year–old woman "who is not taking hormones" and had "multiple benign leiomyomata," *i.e.,* benign fibroid tumors. He further testified that there was no emergency reason to perform either a hysterectomy or an oophorectomy and that the benign fibroid tumors could have been removed without removing the uterus. According to Dr. Segal, there was never any fear that cancer had spread to the ovaries, and "cancer in the uterus was not a concern." Rather, he performed the oophorectomy at Dr. Galandiuk's request pursuant to the written consent form signed by Hoofnel and performed the hysterectomy because Dr. Galandiuk told him that Hoofnel wanted her uterus removed if it was "abnormal." A subsequent pathology report confirmed that neither the uterus nor the ovaries were cancerous.

The majority opinion states that "Appellant admitted the medical necessity of removing her ovaries and uterus during the surgical procedure." *Ante,* at 148. Not so. Hoofnel never made such an admission, nor is such an admission contained in her brief. In fact, Hoofnel testified that (1) neither Dr. Galandiuk nor Dr. Segal ever told her why they removed her ovaries and uterus, and (2) she did not believe her life would be threatened today if her ovaries and uterus had not been removed. In an unsworn response to a request for admission, dated November 14, 2001, Dr. Galandiuk's attorney wrote:

> The procedures which Dr. Galandiuk performed could not be accomplished without the hysterectomy and oophorectomy performed by Dr. Segal. Because of concerns that Ms. Hoofnel may have

extensive cancer, it was felt that that probably required emergency action.

As noted, Dr. Segal specifically refuted any claim that either he or Dr. Galandiuk believed the ovaries and uterus were cancerous or that emergency action was required to remove them. Dr. Galandiuk did not testify—and her operative record does not reflect—that the colon surgery could not have been accomplished without the hysterectomy and oophorectomy. In fact, Dr. Segal testified that when he arrived at the operating room, "[p]art of the bowel surgery had already been performed." He did not testify to any complaints by Dr. Galandiuk that she could not perform the colon surgery because her access to the colon was blocked by the uterus and ovaries. The only mention of this theory is arguably found in Dr. Galandiuk's January 14, 2002, answer to an interrogatory asking why she called Dr. Segal in for consultation:

> After Dr. Segal was consulted because of the condition of Plaintiff's ovaries and uterus, both organs were grossly enlarged. Indeed, the uterus was of such size that the low anterior resection was stapled colorectal low, anterior resection colon J pouch could not be accomplished if the uterus remained. [Sic.]

This is the only statement in the record that advances this theory, which is otherwise unsupported by Dr. Galandiuk's testimony, by her operative report, or by Dr. Segal. Dr. Galandiuk did not assert this alleged "necessity" in her brief in support of her motion for summary judgment, but raised it for the first time on appeal. Certainly, a jury was not required to believe this belated claim in the face of the substantial evidence to the contrary.

> Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an opera-

tion without his patient's consent commits an assault, for which he is liable in damages * * *. This is true, except in cases of emergency where the patient is unconscious, and where it is necessary to operate before consent can be obtained.

*Tabor v. Scobee,* 254 S.W.2d 474, 475 (Ky. 1951) (citation and quotation omitted).

The majority opinion deems the Consent to Operate Form signed by Hoofnel to require summary judgments for both doctors despite the existence of substantial evidence that Hoofnel specifically told Dr. Galandiuk that she did not want her "female parts" removed, that Hoofnel did not know the meaning of the word "oophorectomy" when she signed the consent form, that the consent form did not purport to authorize a hysterectomy, and that there was no medical necessity for either the oophorectomy or the hysterectomy. Furthermore:

> Consent is a process, not a document. Authorization for treatment is the culmination of a discussion between a patient and a health care provider, the disclosure of risk and benefit information, the disclosure of reasonable alternative forms of care, and the posing of questions and answers by both the patient and the provider. Once the patient has agreed to a specific course of treatment, the process is over. . . . The documentation, the so-called consent form, is not the consent, for that lies instead in the conclusion of the discussion between the patient and the physician.

*Kovacs v. Freeman,* 957 S.W.2d 251, 254 (Ky.1997) (quotation omitted).

There were substantial issues of fact in this case that precluded summary judgment. The trial court, the Court of Appeals, and now this Court have simply resolved those factual issues in favor of the doctors, ignoring the evidence to the con-

trary. As noted at the outset of this opinion, a judge's obligation on motion for summary judgment is to identify factual issues, not resolve them. *Brown Found.*, 814 S.W.2d at 276.

Accordingly, I dissent.

WINTERSHEIMER, J., joins.