RENDERED:  AUGUST 18, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1324-MR

CHRISSEN MEADE                                                         APPELLANT

v.
APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 18-CI-04160

STEPHEN A. SCHANTZ, M.D.; AND
WALDMAN SCHANTZ, P.S.C.                                              APPELLEES

OPINION
AFFIRMING IN PART, REVERSING IN PART, AND REMANDING

** ** ** ** **

BEFORE:  CETRULO, ECKERLE, AND GOODWINE, JUDGES.

ECKERLE, JUDGE:  A patient seeking a breast augmentation was given the

choice between saline and silicone implants and specifically consented to saline

implants.  During surgery on the first breast, it was discovered that the patient

required implants almost 50 percent larger than pre-operative measurements

indicated.  Rather than postpone the surgery or implant the largest saline implants

in stock, the doctor elected to place silicone implants inside the patient's body without obtaining the patient's consent. After surgery, the doctor informed the patient of the material difference, and the patient subsequently sued the surgeon and his associated medical practice under various theories of liability. The Trial Court ultimately granted summary judgment in favor of the surgeon and his associated medical practice, and the patient appealed. Having thoroughly reviewed the issues and applicable law, we affirm in part, reverse in part, and remand the grant of summary judgment for additional proceedings.

## BACKGROUND

We present a summary background here, with a more detailed recitation of the evidence in the ANALYSIS section.

Appellant, Chrissen Meade ("Meade"), is a licensed practical nurse who desired to enhance the appearance of her breasts. After seeking recommendations and looking at reviews, Meade consulted with Appellees, Dr. Stephen A. Schantz, M.D. ("Dr. Schantz") at Waldman Schantz, P.S.C., ("Waldman Schantz") for breast augmentation surgery. During the consultation, Meade reviewed numerous photos of breasts and indicated a desire for DD-sized breasts.[1] To achieve this goal, Meade was presented with four different elective

---

[1] It appears the sizing of breasts by cup size is not universal; the same breasts may be a size C in one department store's brassiere and a DD in another. What was apparent from the photo choice book was that Meade desired to substantially increase the size of her breasts.

procedures: a mini-mastopexy[2] with silicone implants; a mini-mastopexy with saline implants; a breast augmentation mammoplexy ("BAM") with silicone implants; or a BAM with saline implants. After discussions with Dr. Schantz and a review of the consent information about the silicone and saline implants, Meade chose to have Dr. Schantz perform a BAM with saline implants. The BAM with saline implants had two distinct differences from the BAM with silicone implants: the former was a cheaper option; and the saline implants carried significantly fewer cautions in the informed consent than the silicone implants.

Pre-operative, external measurements showed that Meade likely needed a 400 or 500 CC saline implant. Dr. Schantz's operating room keeps a stock of different sized implants, both silicone and saline, on consignment from the manufacturers. The stock is replenished by representatives for the manufacturers as the products are used and sold. He had the requisite 400 and 500 CC saline implants in stock prior to the procedure, along with some other sizes of saline implants.

However, once Dr. Schantz made an incision into one of Meade's breasts and used a sizer to verify what implant would be necessary, he believed that to achieve the desired "DD" result Meade would require the largest implants that are FDA approved, 800 CCs. He did not have any of the 800 CC saline

---

[2] This procedure is more commonly referred to as a breast lift.

implants in stock because it is rare to use saline implants and even rarer to need the largest sized saline implants. Also, as it is extremely rare that the pre-operative, external sizing would indicate a much smaller size than was actually needed, Dr. Schantz did not foresee a need to stock the 800 CC size in saline. He did, however, have 800 CC silicone implants in stock. Accordingly, Dr. Schantz admitted that he had three options: (1) abort the procedure, order the proper size, and perform the procedure again at a later date; (2) use the 500 CC saline implants and risk Meade not being satisfied with the result; or (3) use the 800 CC silicone implants and inform Meade that she could have them switched for saline implants using only local anesthesia if she was not satisfied with the silicone implants.

Though Meade admits her augmented breasts are "nice and acceptable" and that Dr. Schantz "did not do a bad job in my opinion," she ultimately filed a Complaint against Dr. Schantz and Waldman Schantz alleging: (1) negligence against Dr. Schantz; (2) vicarious liability against Waldman Schantz; (3) negligence against Waldman Schantz; (4) battery against both Dr. Schantz and Waldman Schantz; and (5) "Lack of informed consent/breach of contract" against Dr. Schantz and Waldman Schantz.

On August 31, 2020, Meade filed a motion for summary judgment, arguing that there was a lack of informed consent, and that Dr. Schantz was liable for breach of contract. Dr. Schantz later filed a motion for partial summary

-4-

judgment on the breach of contract claim. The Trial Court denied Meade's motion and granted Dr. Schantz's partial summary judgment motion. Additionally, the Trial Court ordered Meade to disclose her expert witness as it related to informed consent and her negligence claim.

Meade disclosed her expert, Dr. Leland Deane ("Dr. Deane"). In his deposition, Dr. Deane opined that Dr. Schantz breached the standard of care by using silicone implants without the consent of Meade. He further opined that it was not a breach of the standard of care to need such substantially larger implants than the external examination showed, nor was it unreasonable to believe he would not need 800 CC saline implants prior to surgery, nor was it unreasonable to fail to anticipate a 200 CC or greater difference in the anticipated size needed and the actual size needed. Likewise, Dr. Deane stated that a supermajority of women elect to have the silicone implants, and that modern silicone implants are generally safe.

Dr. Schantz then filed a motion for summary judgment on all claims, which the Trial Court granted, leading to the instant appeal. Each of these motions was thoroughly briefed and orally argued below, and the orders entered resolving them were summary in nature. Meade now appeals these orders and requests that we reverse the grant of summary judgment in favor of Dr. Schantz and Waldman Schantz and remand for further proceedings.

## ANALYSIS

Meade's theories of recovery are admittedly both overlapping and, in some respects, contradictory. Principally her claims involve medical battery, medical negligence, and breach of contract. As the Trial Court's Order resolved on the motions for summary judgment, the following standard applies:

> The proper standard of review on appeal when a trial judge has granted a motion for summary judgment is whether the record, when examined in its entirety, shows there is "no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." CR[3] 56.03. The trial judge must view the evidence in a light most favorable to the nonmoving party, resolving all doubts in its favor. *Spencer v. Estate of Spencer*, 313 S.W.3d 534, 537 (Ky. 2010) (quoting *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky. 1991)). Because summary judgment does not require findings of fact but only an examination of the record to determine whether material issues of fact exist, we generally review the grant of summary judgment without deference to either the trial court's assessment of the record or its legal conclusions. *Malone v. Kentucky Farm Bureau Mut. Ins. Co.*, 287 S.W.3d 656, 658 (Ky. 2009) (citing *Schmidt v. Leppert*, 214 S.W.3d 309 (Ky. 2007)).

*Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010). With this precedent in mind, we now turn to the three claims of liability.

---

[3] Kentucky Rules of Civil Procedure.

-6-

## I.    Battery claim

Meade first alleges that Dr. Schantz committed battery by performing a BAM with silicone implants rather than a BAM with saline implants. Dr. Schantz initially argues that at the trial level Meade stood "mute" and never fairly presented an argument on the battery claim. Dr. Schantz requests that we review this issue for palpable error. Dr. Schantz admits, however, that Meade at minimum made a summary argument that Dr. Schantz committed battery by performing the BAM with silicone without her informed consent.

### A. Preservation

We have reviewed the underlying record and find Meade made ample noise to press her battery claim. Meade argued throughout the summary judgment proceedings, both in written responses and in oral arguments at hearings, that Dr. Schantz should be liable for failing to obtain informed consent to perform a BAM with silicone implants. Throughout these proceedings the concepts of informed consent, medical negligence, and intentional battery blurred together, as even Dr. Schantz admits in his brief that the Trial Court concluded the "[c]laim for battery is really a claim for medical malpractice because it depends on [the physician's] professional judgment." Appellee's Brief at 12.

Ultimately, the Trial Court granted summary judgment in favor of Dr. Schantz on all claims, including the battery claim, rejecting the underlying premise

of lack of informed consent.  But a lack of informed consent is not the tort.  As

Justice Leibson has previously summarized:

> "Lack of informed consent" is not, per se, a tort.  It
> is only a term useful in analyzing medical malpractice
> claims involving two different torts: (a) the type of
> assault and battery which occurs when a physician
> performs an unauthorized procedure, i.e., "where a
> patient *has not consented* to the particular medical
> treatment which was given"; and (b) the type of
> negligence which occurs when a physician has not made
> a "*proper disclosure* of the risks inherent in a treatment."

*Keel v. St. Elizabeth Medical Center*, 842 S.W.2d 860, 862-63 (Ky. 1992)

(Leibson, J., concurring) (citations omitted) (emphasis in original).  Hence, a lack

of informed consent in a medical battery claim is really just a lack of consent

claim.  *See Vitale v. Henchey*, 24 S.W.3d 651, 656 (Ky. 2000) (noting the

confusion between a lack of informed consent claim in medical negligence and a

lack of consent claim in medical battery).

In other words, Meade is not raising a wholly new argument, which

would be unpreserved, *see*, *e.g.*, *Celina Mutual Insurance Co. v. Harbor Insurance

Agency, LLC*, 332 S.W.3d 107, 112-13 (Ky. App. 2010), but has fairly presented

her alternative claims for relief based on the same underlying argument – that there

was no consent, informed or otherwise, to perform a BAM with silicone implants.

However, we do agree with Dr. Schantz that Meade never requested

summary judgment on the battery claim.  Indeed, Meade impliedly admits as much

as her request for relief on appeal is that we reverse and remand the grant of summary judgment in favor of Dr. Schantz. Notably, she does not request that we reverse and remand the denial of a summary judgment motion in her favor on the battery claim. Accordingly, we will review on appeal whether the Trial Court erred by granting summary judgment in favor of Dr. Schantz on the battery claim.

### B. Consent

A medical battery claim is an intentional tort and distinguishable from a medical negligence claim. *Vitale*, 24 S.W.3d at 657-58. A person may establish an action for battery "when a physician performs an operation without the consent of the patient." *Id.* at 656. The medical battery action "is different from a negligence action for medical malpractice because the claim depends on neither professional judgment nor the physician's surgical skill." *Id*. Accordingly, "[i]n establishing a battery claim, a plaintiff must prove the absence of consent." *Andrew v. Begley*, 203 S.W.3d 165, 172 (Ky. App. 2006) (citing *Vitale*, 24 S.W.3d at 658). Additionally, civil battery in the common law is defined as "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him[.]" *Vitale*, 24 S.W.3d at 657 (quoting *Sigler v. Ralph*, 417 S.W.2d 239, 241 (Ky. 1967)). Battery is an intentional tort, and the intention in medical battery is merely the intention to make contact with the person, not to cause harm, and the harmful contact is simply where the touching

results in an impairment or alteration of the person's body. *Vitale*, 24 S.W.3d at 658.

Accordingly, to determine the threshold issue of whether Dr. Schantz was entitled to summary judgment on the battery claim, we must determine whether there was consent to perform the BAM with silicone implants. Reviewing the evidence of record, we hold that there exists a genuine issue of material fact as to whether Meade consented to the BAM with silicone implants; thus the Trial Court erred by granting summary judgment on the medical battery claim.

"Kentucky courts have repeatedly recognized that valid consent to medical treatment is to be gleaned from evidence of the circumstances and discussions surrounding the consent process." *Kovacs v. Freeman*, 957 S.W.2d 251, 255 (Ky. 1997). We must look at the written consent documents, which are "a component" of the consent process, and also at the discussions had between the parties. *Hoofnel v. Segal*, 199 S.W.3d 147, 150 (Ky. 2006).

Initially, we note that written documentation in this case points to two main conclusions, which only a jury may decide: a BAM with saline implants is a different procedure with a different risk profile than a BAM with silicone implants; and Meade only consented to a BAM with saline implants being performed on her person.

-10-

Prior to surgery, Dr. Schantz made it clear to Meade that the two procedures carried different risks. Meade initialed a lengthy document outlining specific surgical risks inherent in various breast enhancement procedures. Among the risks noted were significantly different risks for either saline or silicone implants:

> DEFLATION: Saline: The valve through which the implant is filled can fail and leak over time. The outer shell of the implant can develop a small tear or a pinhole defect and leak. While neither of these problems occurs frequently, when they do, the saline (fluid) leaks out of the implant, and is absorbed by the body. The breast size becomes smaller. Sometimes, only a portion of the fluid leaks out, and the breast does not deflate all the way to the preoperative size. Leakage of saline is not dangerous, but the only solution is to replace the implant with a new one.
>
> Silicone: The rupture of a silicone gel-filled breast implant is most often silent. This means that neither you nor Stephen A. Schantz, M.D. will know that your implants have a rupture most of the time. Rupture can occur at any time after implantation, but they are more likely to occur the longer the implant is implanted. The following things may cause your implant to rupture. Damage by surgical instruments, stressing the implant during implantation, and weakening it, folding or wrinkling of the implant shell, excessive force to the chest (for example, during closed capsulotomy, which is contraindicated), trauma, compression during mammographic imaging, and severe capsular contracture. Breast implants may also simply wear out over time. If rupture occurs, silicone gel may either remain within the scar tissue capsule surrounding the implant (intracapsular rupture), move outside the capsule (extracapsular rupture), or gel may move beyond the breast (migrated

gel). There is also a possibility that rupture may progress from intracapsular to extracapsular and beyond. There have also been health consequences reported in the literature. In fact, the ability of a physical examination by a plastic surgeon who is familiar with breast implants to detect silicone breast implant rupture is 30% compared to 89% for MRI. You will need regular screening and MRI examinations over your lifetime in order to determine if silent rupture is present. You should have your first MRI at 3 years after your initial implant surgery, then every 2 years, thereafter. The cost of MRI screening may not be covered by your insurance, and should be considered in making your decision. If implant rupture is noted on MRI, you should have the implant removed, with or without replacement. Sometimes, these are symptoms associated with gel implant rupture. These symptoms include hard knots or lumps surrounding the implant, or in the armpit, change or loss of size or shape of the breast or implant, pain, tingling, swelling, numbness, burning, or hardening of the breast. You should perform an examination of your breasts to watch for these symptoms. These should be reported to Stephen A. Schantz, M.D., and possibly evaluated with an MRI to screen for rupture.

Surgical Risks p. 19. Additionally, a silicone implant carried a caution regarding

connective tissue disorder:

PRESENCE OF SILICONE RUBBER/CONNECTIVE TISSUE DISORDER: Silicone filled implants are made of silicone rubber. Silicone rubber, more commonly referred to as silicone elastomer, is a synthetic product. Concern over the association of silicone in breast implants to the development of autoimmune or connective tissue diseases, such as lupus, scleroderma, or rheumatoid arthritis, was raised because of cases reported in the literature of small numbers of women with implants. A review of several large epidemiological studies of women with and without implants indicates

> that these diseases are no more common in women with implants than those in women without implants. However, a lot of women with breast implants believe that their implants caused a connective tissue disease.

Surgical Risks p. 20-21. No similar risks were identified for saline implants.

Moreover, Dr. Schantz had prepared four quotes for services: a mini-mastopexy with saline implants; a mini-mastopexy with silicone implants; a BAM with saline implants; and a BAM with silicone implants. Each of these quotes included three references to the type of implant being used: first, as part of the heading describing the quote; second, as a line item describing the implant to be used as part and parcel of the procedure to be performed; and third, as a separate line item showing the medical device to be implanted (silicone or saline implants) with its associated cost. For example, the quote for a "BAM-Saline" included a line item quantity of 1 "Breast Augmentation – Saline" with a corresponding price, and a separate line item quantity of 1 "Saline implants" with a corresponding price. In other words, all of the documentation provided indicated a BAM with saline implants was a different procedure than a BAM with silicone implants.

Likewise, the documentary evidence shows that Meade elected a BAM with saline. She signed a "Consent for Surgery" that read as follows:

> I, Chrissen Meade, desire Stephen A. Schantz, M.D. and such assistants as may be assigned by him/her, to perform the procedure(s) of:

- Surgery – Dr. Schantz Cosmetic – BAM with Saline Implants[4] ~~Mini Mastopexy~~ with Saline Implants.  Sch with TJT on 12/14/16

The nature and purpose of the operation(s), possible alternative methods of treatment, including no treatment/surgery, risks and possible complications have been fully explained to me by Stephen A. Schantz, M.D. and the physician assistant, during my pre-operative consultation.  I understand that this operation is not an emergency nor is it medically necessary to improve or protect my physical health.  I have been advised that all surgery involves general risks, including but not limited to bleeding, infection, nerve or tissue damage, and rarely, cardiac arrest, death, or other serious bodily injury.  I acknowledge that no guarantees or assurances have been made as to the results that may be obtained.

. . .

It has been explained to me that during the course of the operation unforeseen conditions may be revealed that necessitate an extension of the original procedure, and I hereby authorize Stephen A. Schantz, M.D. and/or such assistants as may be selected by him/her to perform such procedures as necessary and desirable, including but not limited to the services of pathologists, radiologists, or laboratory.  The authority granted in this paragraph shall extend to remedying conditions that are not known to Stephen A. Schantz, M.D. at the time the operation commences.

. . .

In signing this consent, I hereby certify that I understand the risks, benefits, and alternatives to my procedure(s)

---

[4] "BAM with Saline Implants" was handwritten above "Mini Mastopexy," which had been struck through as well.

and that I have discussed them with Stephen A. Schantz, M.D.

The form was signed and dated on January 18, 2017.

In addition to the documentary evidence, the depositions submitted by the parties show that different procedures are involved in the implantation of silicone versus saline products, and that Meade had only consented to have a BAM with saline implants to be performed on her person. Initially, in his deposition, Dr. Schantz made it clear that the choice of implant is one that is determined by the client:

> Q. All right. Let me just ask you in general, Doctor, what – how do you counsel patients about whether they choose saline or silicone devices?
>
> A. When they come for the original consultation, we discuss the fact that both saline and silicone implant devices are available to the patient. I discuss what I view to be the benefits of each *and then let* [*sic*] *that open to the patient as to what she chooses*. And it may not be done at that time.
>
> Q. So, is it the patient that decides whether it's silicone or saline implants that are used?
>
> A. *The patient does make the decision as to which implants she would like to have placed*.
>
> Q. All right. And do you make sure that that's in writing somewhere and initialed by the patient prior to the procedure?
>
> A. Yes, we do.

Dr. Schantz Deposition at 8 (emphasis added). And Meade unequivocally made

her election for saline:

> Q. But did Ms. Meade make it crystal clear to you and your staff that she only wanted to use saline?
>
> A. At our initial consultation we discussed both types of implants, and at that time it was not – she had not made her mind up, which is not unusual unless patients come in knowing exactly what they want.
>
> When she came back for her planning session, at that time is when they make the decision because that's usually when they start – they pay either – I think they pay their balance. *So at that time it was known to us that she wanted saline implants*.

Dr. Schantz Deposition at 32-33 (emphasis added).

Additionally, there was a pre-operative verification protocol to

identify the type of implant to be used. In Meade's case, at least once, and

possibly twice, it was confirmed prior to surgery that saline implants were the

election. Dr. Schantz admitted that by January 18, 2017, Meade had

communicated that she wanted saline, not silicone, implants.

Dr. Schantz also noted that one of his staff had written on a consent

for surgery form that Meade was to have "BAM, with saline implants." Dr.

Schantz Deposition at 51. That form was signed by Meade and a member of Dr.

Schantz's staff and dated January 18, 2017, the date of surgery.

-16-

Additionally, the undisputed evidence showed that a BAM with saline implants is a procedure that carries a different risk than a BAM with silicone implants. Dr. Schantz stated that he reviews with his patients the "risks of saline versus silicone." Dr. Schantz Deposition at 43. The information regarding the risks of silicone ruptures is roughly three times as long as the information regarding the risks of saline ruptures. The information noted "hard knots or lumps surrounding the implant, or in the armpit, change or loss of size or shape of the breast or implant, pain, tingling, swelling, numbness, burning, or hardening of the breast" could all be associated with silicone ruptures, but the same were not denoted as associated with saline ruptures. Dr. Schantz did not feel the need to explain this information to Meade; "It's pretty self-explanatory, and I believe she read that on her own." Dr. Schantz Deposition at 48.

Dr. Schantz also admitted that once he realized he did not have a saline implant that he believed would result in the outcome Meade desired, he had three options:

> I had choice A, which would be just to abort the
> procedure because we did not have the proper implant,
> come back and put a – order the implant, come back and
> put the proper size to get the patient to her goal. So that
> meant that's a second surgery.
>
> Choice B was to put a smaller implant than she
> desired in the saline realm knowing that she was not
> going to be happy because we did not achieve her goals,

> according to her pictures, so more than likely coming back and putting in a larger implant at a later date.
>
> Or choice C, which is to put in a silicone implant, which I did have the size proper, felt that it's a superior product, which most women *choose*, and have her have the possibility of not having to have another surgery and another anesthetic *if she was okay with that*. We certainly *made it known to her that I would more than gladly remove the implants and replace them with saline* which could be done under local *if she so desired*.

Dr. Schantz Deposition at 54 (emphasis added).

These options show that Dr. Schantz understood the procedure to which Meade consented was a BAM with saline implants. Choice "C" shows that Dr. Schantz viewed silicone versus saline implants as a choice or an election for the patient. Choice "C" also shows that Dr. Schantz knew what he did not know, namely that he did not know whether Meade would give her consent to perform a BAM with silicone implants. Dr. Schantz consciously and intentionally chose not to perform A or B, both of which aligned with the procedure Meade had elected and which he had consent to perform. Yet he intentionally chose to perform a BAM with silicone implants, a procedure to which Meade had not given consent to perform and for which Dr. Schantz knew he might have to perform another surgery if Meade truly did not post-surgery elect the BAM with silicone implant procedure.

In an effort to vitiate the lack of consent, Dr. Schantz now argues that prior to the operation Meade never specifically objected to silicone implants. This

argument is unavailing, as the dissent in *Vitale* utilized the very same type of argument. 24 S.W.3d at 660 ("Although Henchey did not specifically authorize Dr. Vitale to perform the surgery, neither did he specifically object to his doing so.") (Cooper, J., dissenting). It is thus sufficient to survive summary judgment on the issue of battery that Meade consented to the use of saline and did not specifically reject silicone.

Dr. Schantz also argues that pursuant to *Hoofnel v. Segal*, 199 S.W.3d 147, 149 (Ky. 2006), the "unforeseen conditions" clause in the consent form permitted him to perform a BAM with silicone implants after discovering during the procedure that he would need much larger implants than his pre-operative measurements indicated. We do not agree. First, Dr. Schantz's admission in his deposition indicates that he understood he had two choices that were aligned with Meade's consent – to stop the procedure and perform it later with the correct implants, or to use the saline implants he had available and risk not achieving the desired "DD" size outcome. He also understood that the third choice, which he elected to do without obtaining Meade's consent, was to perform a procedure that he hoped Meade would later not object to having had performed on her. In other words, even with the unforeseen conditions that arose, Dr. Schantz acknowledged that he had options that aligned with the consent; thus, the unforeseen conditions

did not create a necessity for an extension of the procedure, which is all that the consent form permitted.

Second, Meade put forth an expert opinion to rebut this argument. Her expert, Dr. Deane, testified in his deposition that the consent form did not authorize Dr. Schantz to use silicone implants:

> Q. The first criticism you have is that Dr. Schantz breached the standard of care by inserting silicone implants without the informed consent of Ms. Meade, correct?
>
> A. Correct.
>
> Q. And I guess the second criticism is that he failed to wake Ms. Meade up from anesthesia until such a time that she could make a decision about whether she wanted to go forward with the silicone or wait and get saline?
>
> A. Yes.
>
> Q. Why do you believe that he did not have the informed consent of Ms. Meade?
>
> A. Because I saw the informed consent.
>
> Q. She signed the form, and she wanted saline, and she told him that she wanted saline, and therefore, that is a lack of informed consent?
>
> A. Yes. Unless it is documented elsewhere, and I didn't see that.

Deane Deposition at 89.

Finally, *Hoofnel* does not permit so broad a reading of the "unforeseen conditions" clause as Dr. Schantz argues. In fact, quite the opposite is true, as *Hoofnel* found the clause to "authoriz[e] additional procedures that may be medically necessary[.]" 199 S.W.3d at 149. There, during a scheduled surgery for colorectal cancer, it became medically necessary to remove a patient's ovaries and uterus. *Id*. at 148. Summary judgment had been granted to the health care providers on a subsequent battery claim because a written consent form contained the aforementioned clause along with express consent to perform an anterior resection of the colon, appendectomy, and possible bilateral oophorectomy. *Id*. at 148-49. During the surgery, due to the patient having an abnormally large uterus that two medical professionals viewed and believed to be cancerous, and that also contained multiple fibroid tumors and was blocking the surgeon's ability to perform the colon resection, the surgeon performed a medically necessary hysterectomy. *Id*. at 149. Our Supreme Court held that the "unforeseen conditions" clause permitted a procedure that was medically necessary, to wit, "[t]he additional surgical procedure to remove the uterus became medically necessary once the enlarged uterus was observed as it impaired and impeded [the surgeon's] ability to resect the lesion in the colon." *Id*. at 151.

Here, there was neither a medical emergency nor a medical necessity requiring Dr. Schantz to perform a different procedure. We grant to "[e]very

human being of adult years and sound mind . . . a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages[.]" *Tabor v. Scobee*, 254 S.W.2d 474, 475 (Ky. 1951) (internal quotation marks and citation omitted). "This is t[ru]e, except in cases of emergency where the patient is unconscious, and where it is necessary to operate before consent can be obtained." *Id.* (internal quotation marks and citation omitted). Dr. Schantz admitted here there was no medical emergency, and he further admitted it was his choice to perform a different procedure. He also admitted that he knew Meade would have an objection to the different procedure, but hoped it would not be a strong objection:

> And then I explained why we had to use – why I chose to use the silicone. I further explained that if that was something that she had a very strong objection to or felt like she did not wish to have silicone that I was more than happy to exchange that for her at no cost to her.

Dr. Schantz Deposition at 63-64. Meade's expert, Dr. Deane, likewise acknowledged that there was no medical emergency.

Given that the evidence is undisputed that there was no medical emergency that required Dr. Schantz to perform the BAM with saline implants, the unforeseen conditions clause did not permit the use of silicone implants. We liken this case to *Vitale*, where an action in battery lay because a patient consented to a

-22-

certain surgery but not to the particular doctor who performed the surgery. 24 S.W.3d at 654 ("Henchey further testified that, based on Dr. Sparrow's comments to him about Dr. Vitale, he would not have consented to Dr. Vitale performing the surgeries on his mother."). Indeed, "the decision to consent to a particular medical procedure is not a medical decision. Instead, it ordinarily is a personal and often difficult decision to be made by the patient[.]" *Pauscher v. Iowa Methodist Medical Center*, 408 N.W.2d 355, 360 (Iowa 1987). Here, viewing the evidence in a light most favorable to Meade, one can conclude that Meade made a personal decision and consented to saline implants, not silicone, and Dr. Schantz's decision to implant silicone was performed without Meade's consent. *Cf. Hershley v. Brown*, 655 S.W.2d 671, 676 (Mo. Ct. App. 1983) (holding a complaint alleged a battery where patient requested elective sterilization procedure involving burning, cauterizing, and removing portions of the fallopian tubes, but surgeon instead performed sterilization procedure by using a Wolfe ring instrument and implanting a foreign object in patient's body).

Though Dr. Schantz may now argue that Meade never specifically objected to silicone, we note that the dissent in *Vitale* pointed to the very same type of argument, which the majority had rejected. 24 S.W.3d at 660 ("Although Henchey did not specifically authorize Dr. Vitale to perform the surgery, neither did he specifically object to his doing so.") (Cooper, J., dissenting). Thus, it is

sufficient to survive summary judgment on the issue of battery that Meade consented to the use of saline and did not specifically reject silicone.

In summary, our holding here is very narrow. This medical battery claim arose from an elective procedure and circumstances that did not create a medical necessity for a different procedure. In fact, the surgeon admitted he had two options that aligned with the procedure to which the patient had consented.[5] The surgeon intentionally and knowingly inserted into the patient's body a foreign object that the patient had neither expressly nor impliedly chosen to have inserted into her body. Under these facts, summary judgment should not have been granted to Dr. Schantz or Waldman Schantz on the battery claim. Accordingly, we reverse and remand the grant of summary judgment in favor of Dr. Schantz and Waldman Schantz on the medical battery claim. On remand, we note that on a medical battery claim a "plaintiff need not prove actual damages . . . because a showing of actual damages is not an element of battery and, when no actual damages are shown for a battery, nominal damages may be awarded." *Vitale*, 24 S.W.3d at 659 (footnotes and citations omitted).

---

[5] Dr. Schantz notes that Meade indicated she would have brought a lawsuit against Dr. Schantz had he chosen any of the three options. Thus Dr. Schantz opined that proceeding with choice C should be viewed as a reasonable way of potentially avoiding a second surgery. This argument is a *non sequitur*; had Dr. Schantz elected choice A or B, Meade's lawsuit would have no actionable cause under a medical battery claim.

## II.  Medical negligence

Meade next argues that the Trial Court erred by granting summary judgment in favor of Dr. Schantz on the medical negligence claim.  We disagree.

"Generally, 'the plaintiff in a medical negligence case is required to present expert testimony that establishes (1) the standard of skill expected of a reasonably competent medical practitioner and (2) that the alleged negligence proximately caused the injury.'" *Morris v. Boerste*, 641 S.W.3d 688, 698 (Ky. App. 2022) (quoting *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. App. 2006) (citing *Johnson v. Vaughn*, 370 S.W.2d 591, 596-97 (Ky. 1963); *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982))).  While "under certain factual circumstances, the claim of battery may arise in addition to a claim for medical malpractice[,]" *Andrew v. Begley*, 203 S.W.3d 165, 171 (Ky. App. 2006) (citation omitted), Meade does not present such a case.

Meade's claim is that Dr. Schantz was negligent in failing to have the largest sized saline implants on hand for the surgery, and thus committed medical negligence by performing a different procedure and inserting silicone implants into her body.  But Meade's argument is not that the standard of skill for a BAM with silicone implants was breached, but that the very act of performing a BAM with silicone implants is in and of itself a breach of the standard of skill expected of a reasonably competent, medical practitioner.  The argument creates a feedback loop

of litigation.  By performing a non-consented-to procedure, does a doctor *ipso facto* breach the standard of skill expected of a reasonably competent, medical practitioner?  If that were the case, every medical battery claim – an intentional tort – would also constitute medical negligence.

Meade might have actionable claims under both medical negligence and battery if she alleged that Dr. Schantz performed some negligent act that breached the standard of care during the BAM with silicone implant procedure. For example, had Dr. Schantz used the wrong size or type of stitches, or placed the implants incorrectly, or ruptured the implants during the surgery, or performed any number of other, potential, negligent acts, then perhaps Meade might have an actionable, medical negligence claim.

However, the evidence here unequivocally shows that Dr. Schantz intentionally did not perform the procedure to which Meade consented, but it does not show that Dr. Schantz otherwise breached the standard of care while performing the BAM with silicone implants procedure.  The proper cause of action in this fact pattern is battery, and the Trial Court did not err by granting summary judgment on the medical negligence claim.

Additionally, Meade argues that the Trial Court erred by requiring her to support her medical negligence claim with expert testimony, specifically that she must establish that the use of silicone implants was a significant risk for which

she was not warned. We agree with Meade inasmuch as such testimony was not necessary to establish a lack of consent on the battery claim. *See Vitale*, 24 S.W.3d at 656 ("However, the physicians, as did the trial court, confused the issue of *informed* consent, i.e., the failure to disclose a risk or hazard of the surgeries, with the issue of *no* consent, or whether *any valid* consent was obtained prior to . . . performance of the surgeries."). However, to proceed on a medical negligence claim, Meade would likely have had to demonstrate through expert testimony that Dr. Schantz breached the standard of care while performing the BAM with silicone implant procedure. Because Meade does not even make a claim that the BAM with silicone implant procedure was negligently performed, nor does she establish breach, causation, and damages, the Trial Court appropriately granted summary judgment in favor of Dr. Schantz and Waldman Schantz on this issue.

## III. Breach of contract

Finally, Meade argues that the Trial Court erred by granting summary judgment in favor of Dr. Schantz on the breach of contract claim. Meade claims that KRS[6] 304.40-300 does not apply in this case. That statute reads:

> No malpractice liability shall be imposed upon any health care provider on the basis of an alleged breach of any guaranty, warranty, contract or assurance of results to be obtained from any procedure undertaken in the course of providing health care, unless such guaranty, warranty,

---

[6] Kentucky Revised Statutes.

contract or assurance is in writing and signed by the
provider.

It is undisputed that there exists no written contract between Dr.
Schantz and Meade that is in writing and signed by Dr. Schantz. The statute is
clear and unequivocal. When we engage in statutory interpretation, we must give
effect to the intent of the General Assembly, and "[w]here the words used in a
statute are clear and unambiguous and express the legislative intent, there is no
room for construction and the statute must be accepted as written." *Bell v. Bell*,
423 S.W.3d 219, 223 (Ky. 2014) (citation omitted). Here, the statute expressly
states that Meade's cause of action is unsustainable without a "contract . . . in
writing and signed by the provider." KRS 304.40-300. Additionally, longstanding
jurisprudence in this state and sister states demonstrates a reluctance to turn
medical consent documents into legally enforceable contractual obligations. *See*
*Kovacs v. Freeman*, 957 S.W.2d 251, 256-57 (Ky. 1997). There being no
enforceable contract, we affirm the Trial Court's order granting summary judgment
on this claim.

## CONCLUSION

Sufficient evidence was presented to survive a motion for summary
judgment on the battery claim, as the evidence viewed in a light most favorable to
Meade shows that she did not consent to the insertion of silicone implants into her
body. However, the same cannot be said of her negligence and breach of contracts

-28-

claims. Accordingly, we REVERSE AND REMAND the Trial Court's Order inasmuch as it granted summary judgment in favor of Dr. Schantz on the battery claim, but otherwise AFFIRM the Order on all other grounds.


ALL CONCUR.


BRIEFS FOR APPELLANT:

J. Dale Golden
Laraclay Parker
Alexandra DeMoss-Campbell
Lexington, Kentucky

BRIEF FOR APPELLEES:

Mark E. Nichols
Sarah C. Clark
Lexington, Kentucky